[No. 3078.   June 14, 1926.]

## STATE v. ROGERS.

[247 Pac. 828.]

### SYLLABUS BY THE COURT

1.   Section 14 of article 2 of the Constitution of New Mexico as amended at the 1924 general election (see Laws 1923, p. 351), providing that, "No person shall be held to answer for a capital, felonious or infamous crime unless on a presentment or indictment of a grand jury or information filed by a district attorney or Attorney General or their deputies, except in cases arising in the militia when in actual service in time of war or public danger.   No person shall be so held on information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination," is self-executing."

2.   A constitutional provision which is complete in itself needs no further legislation to put it in force, but is self-executing."

3.   In the prosecution of a defendant by information for a felony, it is not necessary that the information should allege that the defendant had had a preliminary examination before an examining magistrate, or had waived such preliminary examination.

4.   When the information is filed in court by the officer authorized by the Constitution to file same, the presumption of law is that it is legal—that the examination of the defendant has been had or waived.

5.   Whether an examination has or has not been had is not a question of pleading, but a question of fact, to be raised by the defendant or not, at his option, by plea in abatement or otherwise.

6.   Although the information alleges that there was a preliminary examination, it, being an immaterial allegation, need not be proved as a distinct fact.

7.   The court having defined murder without making application of the definition to the facts of the case, and this being a prosecution of the defendant for assaulting another with intent to murder him, the court should have given defendant's tendered instruction No. 5, which defined murder and applied such definition to the case on trial

[1]   12CJ p. 729 n. 45, 46, 47, 48, 49, 50; p. 731 n. 66.   [2] 12CJ p. 729 n. 48; p. 731 n. 63.   [3-5]   31CJ p. 406 n. 30; p. 540 n. 56 New; p. 643 n. 98, 99.   [6] 31CJ p. 837 n. 18. [7]   30CJ p. 355 n. 80.   [8]   30CJ p. 356 n. 87.   [9]   30CJ p. 20 n. 18; p. 25 n. 49, 50; p. 354 n. 69.   [10]   29CJ p. 286 n. 22.   [11]   23CJ p. 179 n. 71; 31CJ p. 705 n. 1; p. 707 n. 10.

coupled with a declaration as to the essential element of intent to effect the death of the prosecuting witness.

8. The court having instructed the jury that in order to justify a verdict of guilty of the crime of assault with intent to murder, the facts and circumstances proved in the case must be such that if death had resulted from the shooting the jury would have found the defendant guilty of one of the degrees of murder, and, it being the theory of the defense that if death had resulted from the shooting in this case the defendant would have been guilty of no greater offense than manslaughter, he was entitled to his requested instruction No. 6, which presented this theory.

9. The court's instruction No. 8 is as follows:

"If you believe from the evidence and beyond a reasonable doubt that Marcelino Padilla was injured by a bullet fired from a rifle by the defendant which she then and there held, and defendant was then and there unlawfully, deliberately, and with premeditated malice firing said rifle without any excuse or justification, and in a way greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, and said Marcelino Padilla was then and there in a place where he had a right to be, then the defendant is guilty as charged in the information."

**Held** this instruction to be error, because it omits the requirement that there must have been an intent to murder on the part of the defendant, and only requires an intent to perpetrate the act of shooting the rifle in a way greatly dangerous to the lives of others, and in indicating a depraved mind regardless of human life.

Appeal from District Court, Santa Fé County; Holloman, Judge.

Mrs. John Rogers, alias Teresa Rogers, was convicted of assault with intent to murder, and she appeals. Reversed and remanded for a new trial.

Catron & Catron, of Santa Fé, for appellant.

John W. Armstrong, Atty. Gen., and J. N. Bujac, Asst. Atty. Gen., for the State.

### OPINION OF THE COURT

BICKLEY, J.   The appellant, Mrs. John Rogers, alias Teresa Rogers, was, on the 7th day of April, 1925, in Santa Fé county, N. M., charged by information filed by the assistant district attorney for said county with an assault with intent to murder Marcelino Padilla. The information charges that the defendant did

make an assault upon the person of Marcelino Padilla while armed with a rifle, which rifle was loaded with gunpowder and leaden bullets, which said rifle defendant had and held in her hands, and which she, the defendant, did shoot off and discharge at, towards, in and upon him, the said Marcelino Padilla, thereby and thus striking him with one of said leaden bullets thus shot off and discharged out of said rifle, inflicting upon the arm of said Marcelino Padilla two serious, grave, and painful wounds, "with intent then and there him, the said Marcelino Padilla, to kill and murder, contrary to the form of statute in such case made and provided." The testimony of the prosecution shows that on the night of Washington's Birthday, February 22, 1925, there was a dance at Cerrillos, Santa Fé county, N. M. After the dance Jose Rael, Samuel Martinez, Simplicio Leyba, and Lalo Espinosa went to the house of the defendant to drink some "chake" beer. Enrique Barreras and Pedro Gonzales were already there. The concensus of opinion is that "chake" beer is not intoxicating, but is similar to near beer. This seems not to be material to the case. Enrique Barreras broke some glasses. The defendant came in from another room and told him not to break her glasses and to please leave the house. Enrique Barreras grabbed defendant by the throat and pushed her aside. This angered defendant, and she told Enrique that she would show him who she was, or words of like character. She then went into another room and got a rifle and came back. In the meantime Enrique Barreras and Pedro Gonzales had left the house. Defendant went outside, taking the rifle with her, the other people remaining inside. Three shots were heard, and then Mrs. Rogers came back in the house and put the gun away. When Enrique Barreras and Pedro Gonzales left, they went back of Mrs. Rogers' house, but when the shots were fired they ran away. Witnesses did not see who fired the shots, nor do they know in what direction they were fired. It was very dark between 12 and 1 o'clock at night. After defend-

and came back to the house she asked Lalo Espinosa to leave, and he left. A few minutes after Lalo Espinosa left, one of the windows in another room of the house was broken, and in about three minutes another window in another room of the house was broken. These windows were broken by rocks from the outside. Mrs. Rogers then got her gun and went out, and three shots were heard, but no one saw who fired them nor in what direction they went. In about five minutes some more shots were fired, and Mrs. Rogers came in the house. At the time of the firing of the last three shots some one outside uttered a cry, and Mrs. Rogers asked Jose Rael to go and see who was hurt. Jose Rael went out, and he and Lalo Espinosa found Alfredo Martinez on the ground and took him to his house. At the time of the firing of the first shots, Alfredo Martinez was at home in bed. His mother called him, and he got up and went to get Marcelino Padilla. Both Alfredo Martinez and Marcelino Padilla were deputy sheriffs of Santa Fé county. After the second group of shots had been fired, they both started toward the house of Mrs. Rogers, from which direction the shots seemed to have been fired. They approached the house on the west side, traveling south, where there was a window to a lighted room. When they had come to within 25 or 30 feet of the house to one side of the window but not within the light cast through the window, Padilla was cautioning Martinez not to get within the light of the window, as some one might shoot from the window. At this time a shot was fired from a southerly direction. The bullet struck a rock or some other object, exploded, and a small particle of the bullet struck Marcelino Padilla in the right arm, piercing the skin and lodging between the skin and flesh. Something scratched his left hand, but he does not know what. Two other shots were fired about the same time and hit Alfredo Martinez in the right leg. It was so dark that the witnesses could not see any distance. They did not see where the shots were fired from nor who fired

them. The defendant was arrested by Marcelino Padilla, who took her with him to Dr. Palmer's house to have his wounds attended to. He was advised that there was no necessity to remove the particle of exploded bullet, and it was not removed until several months later. At no time had Marcelino Padilla been at the house of Mrs. Rogers that night before he went and arrested her. Marcelino Padilla testified that he was only hit by a part of the bullet, and that the bullet evidently had exploded when it hit against something; that there were rocks on the ground; and that there were cottonwood trees on the left side (inferentially on the left side of where the witness was standing when hit).

The testimony adduced by defendant does not substantially conflict with the testimony of the prosecution, but adds to and shows the declared intention of the defendant in firing the shots. The following is a narrative statement of the defendant's testimony, taken from the brief of defendant's counsel, which we think is substantially correct:

"Mr. Clyde Hendricks, Mr. Mahoub, Miss Motto and Mrs. Rogers came to Mrs. Rogers' house from the dance to have a lunch. They were in the dining room. Mrs. Rogers serves lunches. They had some sandwiches, but nothing of any kind to drink. While they were having their lunch, some people in another room, who had come from the dance broke some glasses. Henry Barreras was breaking glasses. Mrs. Rogers went to the kitchen and asked him to leave. He jumped up and grabbed her by the neck and pushed her away. Mrs. Rogers told him he could not come to her house and do that way, and went and got a gun. When she came back with the gun Henry Barreras and Pedro Gonzales were gone. Mrs. Rogers shot the rifle at the ground to scare them away. She then came back into the house and went into the dining room. Then a dining room window was broken from the outside. She went out again and shot two shots into the ground to scare the people who were breaking her windows away and to protect her property. She came back into the house, and had just reached the dining room when a window in the bedroom was broken with a big rock; the rock was on the floor. She went outside again by her kitchen window and saw two figures whispering to each other and looking in her window. She fired one shot in the ground to scare them. She could hear them running, and fired two more shots into the ground to scare them. She came back into

the house. She knew some one had been hit, because she could hear him holler. She asked Jose Rael to go see who it was that had been shot or what had happened. Then Marcelino Padilla came to the door, and she let him in. She still had the gun in her left hand, pointing up in the air. Marcelino Padilla grabbed her by the arm and told her she had to go to Santa Fe with him. He took her rifle from her, and they went to Dr. Palmer's, and she dressed Marcelino Padilla's arm. When the shooting took place, Mrs. Rogers could not see anything distinctly, only shadows, just in distinct outlines. All shots were fired at the ground. Mrs. Rogers did not aim at any one. She did not intend to hit anyone, only scare them away and protect her property. She had no intention of killing any one. Macelino Padilla had not been at the house of Mrs. Rogers before he came there to arrest her. When the last two shots were fired, Mrs. Rogers could not see any one, and did not know whether the shots were in the direction of any one or not, but she shot at the ground."

Both at the close of the case of the state and at the close of the taking of all the evidence the defendant demurred to the evidence and asked for an instructed verdict of not guilty. These demurrers were based upon the proposition that the prosecution had wholly failed to prove the allegations of the criminal information, and that there was no evidence to show that Mrs. Rogers had committed an assault on Marcelino Padilla with a rifle with intent to murder him, but that on the contrary she did not even know that Marcelino Padilla was in the vicinity; that she was only shooting to scare away the people who were molesting her and destroying her property; that in the act of shooting the firearm under the circumstances she might have been committing some crime, but that the crime of assault with intent to murder Marcelino Padilla as charged in the criminal information was not made out by the evidence.

The first point presented by appellant is that the court erred in holding the defendant to answer the charge of assault with intent to murder upon a criminal information filed by the assistant district attorney. The argument is: (a) The charge being of a felony, it could only be prosecuted upon an indictment presented by a grand jury; (b) if the court had power to try the defendant upon a criminal information under

the Third Amendment to the constitution of the state of New Mexico, then the court erred in depriving the defendant of her constitutional right to presentation by information without having had a preliminary examination before an examining magistrate. It seems to have been conceded, and we proceed upon the assumption, that the information charges a felony.

[1] Section 14 of article 2 of the original Constitution of the state of New Mexico, in so far as is material, is as follows:

"No person shall be held to answer for a capital, felonious or infamous crime unless on a presentment or indictment of a grand jury. * * *"

The electors of New Mexico at the election in 1924 adopted an amendment (see Laws 1923, p. 351), to said section, which amendment became effective on January 1, 1925. A portion of the amendment is as follows:

"No person shall be held to answer for a capital, felonious or infamous crime unless on a presentment or indictment of a grand jury or information filed by a district attorney or Attorney General or their deputies, except in cases arising in the militia when in actual service in time of war or public danger. No person shall be so held on information without having had a preliminary examination before an examining magistrate, or having waived such preliminary examination."

There was carried into the 1915 codification as section 4430 a portion of the Kearney Code, as follows:

"All criminal offenses, except those cognizable before justices of the peace, shall be preferred by indictment of grand jury or by information."

This provision, however, being in part inconsistent and in conflict with section 14 of article 2 of our Constitution as it stood prior to amendment, ceased to be a law in so far as in conflict with the provision of the Constitution. The portion of section 4430 not in conflict with the original provision of the Constitution may be said to be:

"All criminal offenses, except those cognizable before justices of the peace, shall be preferred by indictment of grand jury."

It is urged by appellant that, as section 21 of article 22 of the New Mexico state Constitution provides that, ''The Legislature shall pass all necessary laws to carry into effect the provisions of this Constitution,'' and as the Legislature of New Mexico at the 1925 session thereof by an act approved March 20, 1925 (Acts 1925, c. 145), provided ''An act to vitalize the amendment to the Constitution adopted at the November election, 1924, and providing procedure in criminal cases and repealing all laws in conflict therewith,'' considered in connection with the language of the amendment itself, goes to show that the said amendment was not self-executing, and was not considered by the New Mexico Legislature. It is also urged that, as the act to vitalize the amendment did not carry an emergency clause, its provisions were not in effect at the time of the filing of the criminal information on the 27th day of April, 1925, and that it had not gone into effect at the time of the trial and the judgment and sentence of the court in May, 1925, and therefore, that if the vitalizing act was not in effect and the constitutional amendment was not self-executing, then there was no law existing in New Mexico which authorized the district attorney or his assistants to present a criminal charge by information in this case.

In 12 C. J. on ''Constitutional Law,'' par. 106, it is said:

''It is within the power of those who adopt a Constitution tion to make some of its provisions self-executing, with the object of putting it beyond the power of the Legislature to render such provisions nugatory by refusing to pass laws to carry them into effect; and where the matter with which a given section of the Constitution deals is divisible, one clause thereof may be self-executing and another clause or clauses may not be self-executing. Constitutional provisions are self-executing when there is a manifest intention that they should go into immediate effect, and no ancilliary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed. That a right granted by a constitutional provision may be better or further protected by supplementary legislation does not of itself prevent the provision in question from being self-executing; nor does the self-executing character of the constitutional provision necessarily preclude legislation for the better protection of the right secured.''

[2] In Lanigan v. Gallup, 17 N. M. 627, 131 P. 997, we had occasion to define what self-executing constitutional provision is. We there said:

"A constitutional provision may be said to be self-executing when it takes immediate effect and ancillary legislation is not necessary to the enjoyment of the right given, or the enforcement of the duty imposed. In short, if a constitutional provision is complete in itself, it executes itself."

Several cases and authorities were cited in support of the above declaration, and among them Davis v. Burke, 179 U. S. 399, 21 S. Ct. 210, 45 L. Ed. 249. In that case the following clause of the Constitution of Idaho was under consideration:

"Art. 1, sec. 8. No person shall be held to answer for any felony or criminal offense of any grade, unless on presentment or indictment of a grand jury, or on information of the public prosecutor, after a commitment by a magistrate."

It was contended by the accused that that provision was not self-executing. The court said:

"But we are also of opinion that for the purposes of this case the provision of the Idaho Constitution must be deemed self-executing. The rule is this stated by Judge Cooley in his work upon Constitutional Limitations (page 99): 'A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law. Thus, a constitution may very clearly require county and town government; but if it fails to indicate its range, and to provide proper machinery, it is not in this particular self-executing, and legislation is essential.'

"Where a constitutional provision is complete in itself it needs no further legislation to put it in force. When it lays down certain general principles, as to enact laws upon a certain subject, or for the incorporation of cities of certain population, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution. But where a Constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions. In short, if complete in itself, it executes itself. When a Constitution declares that fel-

onies may be prosecuted by information after a commitment by a magistrate, we understand exactly what is meant, since informations for the prosecution, of minor offenses are said by Blackstone to be as old as the common law itself, and a proceeding before magistrates for the apprehension and commitment of persons charged with crime has been the usual method of procedure since the adoption of the Constitution. It is true the Legislature may see fit to prescribe in detail the method of procedure, and the law enacted by it may turn out to be defective by reason of irregularity in its passage. In such case a proceeding by information might be impeached in the state court for such irregularity, but it certainly would not be void so long as it was authorized by the Constitution. For us to say that the accused had been denied the process of law would involve the absurdity of holding that what the people had declared to be the law was not the law."

A similar question was before the Supreme Court of Missouri in State v. Kyle, 166 Mo. 287, 65 S. W. 763, 56 L. R. A. 115. The court said:

"And not until the amendment of section 12, art. 2, of the state Constitution, adopted at the general election held on the 8th day of November, 1900, by which it is provided that 'no person shall be prosecuted criminally for felony or misdemeanor otherwise than by indictment or information, which shall be concurrent remedies.' could a person be prosecuted criminally in this state for a felony otherwise than by indictment, 'except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or public danger;' but since that time they have been, and are now, concurrent remedies."

Upon the question as to whether the amendment was self-executing, the court said:

"The next question is, was the amendment in question self-operating from the time it took effect? It pertains to criminal procedure, and is prohibitory in character and it is well settled that all such clauses in a Constitution are self-enforcing. Board v. Patten, 62 Mo. 444; Householder v. City of Kansas, 83 Mo. 488; Hickman v. City of Kansas, 120 Mo. 110, 25 S. W. 225, 23 L. R. A. 658, 41 Am. St. Rep. 684. There are a number of provisions in the Constitution of this state that are unquestionably self-executing, and require no legislation to put them in operation. The test in such cases is, can the Constitution, as amended, be enforced without the aid of legislation? 'The question in every case is whether the language of a constitutional provision is addressed to the courts or the Legislature. Does it indicate that it was intended as a present enactment, complete in itself as definitive legislation? Or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration both of the language used and of the intrinsic nature of the provision

itself. If the nature and extent of the right conferred and of the liability imposed are fixed by the provision itself, so that they can be determined by the examination and construction of its own terms, and there is no language used that the subject is referred to the Legislature for action, then the provision should be construed as self-executing and its language addressed to the courts.' Willis v. Mabon, 48 Minn. 140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626. There is nothing in the language used in the amendment which indicates that subsequent legislation was necessary or intended to carry it into effect; nor was it, as it simply prohibits any other mode for the prosecution of felonies (except certain cases, as therein provided), otherwise than by indictment or information. The case of Fusz v. Spaunhorst, 67 Mo. 256, is distinguishable from the one at bar, in that the section of the Constitution under which that case arose declared that it should be a crime, the nature and punishment of which shall be prescribed by law, clearly indicating that subsequent legislation was in the minds of the lawmakers necessary to carry it into effect, while no such intimation is to be found in the amendment in question, nor can it be inferred from the language used.

"The terms 'information' and 'indictment,' as used in the Constitution, have reference to and are to be understood in their common-law sense. Ex parte Slater, 72 Mo. 102; State v. Kelm, 79 Mo. 515. In the Kelm Case it was held that the term 'information,' as used in article 2, § 12, of the state Constitution of 1875, was to be understood in its common-law sense; that is a criminal charge, which at common law is presented by the Attorney General, or, if that office is vacant, then by the solicitor general of England, and in this state by the prosecuting attorney of the respective counties, who exercise the same powers as are exercised by the Attorney General or solicitor General of England—that is, the power to present informations under their official oaths."

A consideration of the language of the constitutional provision itself indicates that it was intended that it should be self-executing. Certain directions were given to the Legislature as to the information of grand juries and their powers. Not being willing, however, to risk the provision becoming nugatory by the failure of the Legislature to pass the requisite laws, it was provided:

"Until otherwise prescribed by law a grand jury shall be composed of twelve in number, of which eight must concur in finding an indictment. A grand jury shall be convened upon order of a judge of a court empowered to try and determine cases of capital, felonious or infamous crimes at such times as to him shall be deemed necessary, or a grand

jury shall be ordered to convene by such judge upon the filing of a petition therefor signed by not less than seventy-five resident taxpayers of the county, or a grand jury may be convened in any additional manner as may be prescribed by law."

It is also provided that:

"In all criminal prosecutions, the accused shall have the right to appear and defend himself in person, and by counsel; to demand the nature and cause of the accusation; to be confronted with the witnesses against him; to have the charge and testimony interpreted to him in a language that he understands to have compulsory process to compel the attendance of necessary witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

See Laws 1923, p. 351.

The Supreme Court of Oklahoma reached the conclusion that provisions of its Constitution similar to the provision of the amendment under consideration were self-executing. See Ex parte McNaught, 1 Okl. Cr. 260, 100 P. 27; Id. 1 Okl. Cr. 528, 99 P. 241.

No direction was given to the Legislature as to the procedure concerning informations, but, was pointed out in State v. Kyle, supra, in the absence of qualifying language, the term "information" in the Constitution has reference to and is to be understood in its common-law sense.

By section 1355 of the 1915 codification it is declared:

"In criminal cases, the common law, as recognized by the United States and the several states of the Union, shall be the rule of practice and decision."

And in Territory v. Montoya, 17 N. M. 122, 125 P. 622, we said:

"The common law of crimes is in force in New Mexico, except where it may have been repealed or modified by statute. Likewise common-law procedure continues in force here except where special provision is made by statute to the exclusion of the common-law procedure."

So that no difficulty presents itself in executing the provision that felonies may be presented by informa-

tion when the common law may be looked to for the practice concerning informations. We conclude, therefore, that the provision of the Third Amendment under consideration is self-executing.

The information alleges that:

"The said Mrs. John Rogers, alias Teresa Rogers, has heretofore had her preliminary hearing before a committing magistrate."

[10] It is claimed by appellant that, as the pleader substituted "preliminary hearing" for the words "preliminary examination" used in the amendment and substituted "committing magistrate" for the clause "examining magistrate" contained in said amendment, the proceedings are inherently and fatally defective. We do not think so. "Hearing" in criminal law is defined as the examination of a prisoner charged with a crime or misdemeanor and of the witnesses for the accused. See Bouv. Law Dict. (Rawle's 3d. Rev.) vol. 2, p. 1429; Cyclopedic Law Dictionary, p. 435; Black's Law Dictionary, p. 564. Webster's New International Dictionary defines "hearing" as a "listening to facts and evidence, for the sake of adjudication." In our opinion, "preliminary hearing" and "preliminary examination" are synonymous terms.

[11] A magistrate is defined as "one of the class of inferior judicial officers, such as justices of the peace and police justices." Black's Law Dictionary.

By article 8 of chapter 64, codification 1915, preliminary examinations in criminal offenses are intrusted to justices of the peace, and such magistrates are given power to "commit to jail" in certain cases. 23 C. J. 179, defines "examining court" as follows.

"A term applied to a magistrate when sitting for the purpose of inquiring into a criminal accusation against a person."

And the Century Dictionary defines "committing magistrate" as "one whose duty it is, on probable evidence, to commit accused persons for trial by a higher court, or to require suitable bail for their appearance."

So it would seem that there is no substantial difference in the import of these two expressions.

Even if the **allegation that the** defendant had a preliminary examination before an examining magistrate is necessary, the use of equivalent words would be sufficient, particularly if the allegation is not descriptive of the offense. See 31 C. J'. 705, "Indictment and Information."

[**3-5**] As the appellant also urges that the prosecution failed to prove that Mrs. Rogers had had a preliminary examination before an examining magistrate, we will consider whether such proof was necessary, although it is claimed by the appellee that such fact was proved. In the first place, the rule is that it is not necessary that the information allege that the accused had a preliminary examination before an examining magistrate or had waived such preliminary examination. See 31 C. J. "Indictment and Information," § 159, and cases cited. Characteristic of the decisions cited in support of the text is Canard v. State, 2 Okl. Cr. 505, 103 P. 737, 881, 139 Am. St. Rep. 949.

This case reviews many of the decisions of the courts of other states in support of the conclusion reached. The court said:

"Counsel for defendants urge with much force that the trial court acquires no jurisdiction of a felony charge prosecuted by information, unless the defendant has had a preliminary examining trial, or has waived the same, and that the information must allege one or the other. We agree with the counsel that there must be an examination or a waiver, but do not agree with their contention that it is necessary to plead this examination or waiver in order to give the court jurisdiction. We understand the rules governing prosecutions by information to be identical with those governing prosecutions by indictment. When the information is filed in court by the prosecuting attorney, the presumption of law is that it is legally done; that the examination of the defendant has been had or waived, and consequently the court has jurisdiction the same as when an indictment has been returned by a grand jury in open court. When an indictment is presented by a grand jury in open court, the presumption is that it is legally presented; that the jurors were properly summoned, legally qualified, and competent, and that the required number,

at least concurred in the finding. These facts, though essential to the lawful finding and presentment, are. not necessary to be set forth in the indictment. Washburn v. People, 10 Mich. 372. Whether an examination has or has not been had is not a question of pleading, but a question of fact to be raised by the defendant or not at his option, which fact is always within the knowledge of the defendant. If he claims that his right or privilege has been denied to him, and will insist on his right to it, he can and should do so when he is arraigned on the information. The fact that a prisoner has not been given an examination before an examining magistrate before the filing of an information against him is a matter that may be properly pleaded in abatement, or by motion to quash, which is.in the nature of a plea in abatement, founded on affidavits or such other proofs as the court may permit. If it were necessary to allege a preliminary hearing, it would be necessary to prove it. Would this not work prejudice to the defendant? Would not proof that the examining magistrate had believed the defendant guilty .on examining trial influence the jury against him? Would it not put upon the defendant an additional burden to permit the prosecuting attorney to argue as a circumstance tending to establish defendant's guilt that the examining magistrate who held the examination immediately after the commission of the alleged crime believed the defendant guilty?

"We find that the courts of Iowa, Delaware, Idaho, Michigan, Washington, Kansas and Califorina have passed on the question at issue here under similar constitutional provisions and statutes, and have all held against the contention of counsel for defendant."

[6] Even though the fact that there had been a preliminary examination before an examining magistrate was alleged, it was not necessary to prove it, as such allegation did not constitute a part of the description of the offense. In State ʝv. Barr, 7 Penniwill (Del.) 340, 79 A. 730, the court said.

"The information alleges that there was a preliminary examination, but our courts have held that an immaterial allegation need not be proved as a distinct fact."

See also, State v. Herrera, 28 N. M. 155, 207 P. 1085, 24 A. L. R. 1134.

Our conclusion is that appellant's argument that her constitutional guaranty of a preliminary examination prior to being informed against had been evaded by failure of the prosecutor to properly plead and prove that such preliminary examination had previously oc-

curred is not sound. If in fact the defendant had not been accorded a preliminary examination prior to the filing of the information, it was her privilege to present that fact to the court by plea in abatement or other appropriate remedy.

[7] Appellant next complains of the refusal of the court to give certain instructions requested by the defendant, and of certain instructions given by the court. The court gave abstract definitions of the crime of murder, but did not make application of such definitions to the facts of the case. The court properly instructed the jury that:

"In order to justify a verdict of guilty of the crime of assault with intent to murder, the facts and circumstances proved in the case must be such that if death had resulted from the shooting the jury would have found the defendant guilty of one of the degrees of murder."

Appellant requested her instructions Nos. 5 and 6 as tendered by her. They were as follows:

"5.    Murder is defined as the unlawful killing of a human being, with malice aforethought, either express or implied. It is divided into first degree murder and second degree murder. All murder which shall be perpetrated by means of poison or lying in wait, torture, or by any kind of wilful, deliberate, and premeditated killing, or which is committed in the pepertration of or attempt to perpetrate any felony, or perpetrated from a deliberate and premeditated design unlawfully and maliciously to effect the death of any human being, or perpetrated by an act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, shall be deemed murder in the first degree; and all other kinds of murder shall be deemed murder in the second degree. As applied to the case now on trial the shooting of the said Marcelino Padilla by the defendant, if you believe such shooting there was, must have been with malice aforethought, deliberate and premeditated and with intent to effect the death of the said Marcelino Padilla in order to constitute murder in the first degree had the said Marcelino Padilla died as a result thereof, and it must have been malice aforethought and premeditation and intent to effect the death of the said Marcelino Padilla in order to be murder in the second degree had the said Marcelino Padilla died as a result thereof.

"6.    If you believe from the evidence that Mrs. Rogers, alias Teresa Rogers did on the 22nd day of February, 1925, make an assault upon the said Marcelino Padilla with

a 30:30 rifle loaded with gunpowder and leaden bullets, and did discharge the same in and upon the said Marcelino Padilla inflicting upon him wound or wounds, and that such shooting grew out of a sudden quarrel or in the heat of passion or in the commission by the said Mrs. Rogers, alias Teresa Rogers, of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection, then it is your duty to find the defendant not guilty, for in law, had death resulted, the defendant would be found guilty of manslaughter."

We think defendant was entitled to her requested instruction No. 5, because it makes application of the definitions of murder to the case on trial and incorporates the essential element of the intent to murder, which is not elsewhere covered in the instructions. The essential element of intent in this kind of a case will be discussed later in this opinion.

[8] We think defendant was entitled to her requested instruction No. 6, because, the court having informed the jury in its instruction No. 6 that the case must be such that if death had resulted from the shooting the defendant would have been guilty of one of the degrees of murder defined in other instructions, the jury should have been informed of the elements constituting manslaughter, because if the act of the defendant was an unlawful act which resulted in a battery upon the prosecuting witness from which, if such prosecuting witness had died, defendant would have been guilty of manslaughter, still he would not have been guilty of assault with intent to murder a person named in the information, for an assault to commit manslaughter is not known to the statutes of New Mexico, although in some states an assault with an intent to commit manslaughter is a crime. See Michie on Homicide, p. 274. Sometimes states make it a crime to commit an "assault with intent to kill," but ours does not thus read, but makes it a crime to assault "with intent to murder," and the jury, in the absence of instructions explaining that all unlawful killing is not murder, might labor under a confusion of ideas to the prejudice of the defendant.

"It is the duty of the court to instruct the jury, in a criminal case, on each theory of the defense, where there is any evidence to establish it." Territory v. Baca, 11 N. M. 559, 71 P. 460.

Appellant complains of the action of the court in giving instructions Nos. 4 and 8, which are as follows:

"4    Under the law one who deliberately and with premeditated malice perpetrates any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, and which results in the death of a person, is guilty of murder."

"8.    If you believe from the evidence and beyond a reasonable doubt that Marcelino Padilla was injured by a bullet fired from a rifle by the defendant which she then and there held, and defendant was then and there unlawfully, deliberately, and with premeditated malice firing said rifle without any excuse or justification, and in a way greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life, and the said Marcelino Padilla was then and there in a place where he had a right to be, then the defendant is guilty as charged in the information."

No. 4 states the abstract proposition of law correctly, and would have been harmless if coupled with proper instructions incorporating the essential element of intent to murder in a prosecution for assault with intent to murder.

[9] We think the court's instruction No. 8 is erroneous. Neither in instruction nor elsewhere is the jury informed that an intent to take human life is a necessary ingredient of the crime of assault with intent to commit murder.

"The specific intent to take human life is an essential element of the offense of assault with intent to commit murder." 30 C. J. "Homicide," par. 164.

"An intent to kill on the part of the assailant is an essential element of the offenses of assault with intent to murder and assault with intent to kill." Michie on Homicide, p. 275.

"To commit murder, one need not intend to take life; but to be guilty of an attempt to murder, he must so intend. It is not sufficient that his act, had it proved fatal, would have been murder." Bishop on Criminal Law (9th Ed.) vol. 1, § 730.

"We have seen that an unintended taking of life may be murder without the specific intent to commit it—a rule

the latter branch whereof appears probable in a few of
the states to have been interfered with by statutes.. For
example, "if one from a housetop recklessly throw down
a billet of wood upon the sidewalk where persons are con-
stantly passing, and it fall upon a person passing by and
kill him, this would be by the common law murder. But
if, instead of killing, it inflicts only a slight injury, the
party could not be convicted of an assault with intent to
commit murder,; since, in fact, murder was not intended."
Bishop 'on Criminal Law (9th Ed.) vol. 1, § 736.

"Without specific intent to kill there can be no assault
with intent to murder, and this is the rule though intent
to' kill is not necessary to constitute murder." Wharton on
Homicide § 138.

People v. Mendenhall, 135 Cal. 344, 67 P. 325, is cited
by the author. The court there said:

"It is not contended that the court erred in refusing to
instruct the jury, as requested, that: 'While intent to take
life is not essential to constitute murder, yet, to constitute
an assault with intent to commit murder, the wrongdoer
must specifically intend to take life. You cannot find
this defendant guilty simply because he would have been
guilty of murder had the prosecuting 'witness died.' This is
a correct statement of the law, and its refusal would have
been error entitling the defendant to a reversal of the
judgment if the same proposition had not been plainly
stated in other instructions given by the court, and couched
in language which in a conceivable case was much more
appropriate than the language quoted."

In .Territory v. Vigil, 8 N. M. 583, 45 P. 1117, we
decided:

"On a trial on indictment charging an assault with in-
tent to murder, an instruction to the jury that all that was
necessary for the prosecution to prove, to warrant a ver-
dict of guilty, was sufficient to satisfy them beyond a
reasonable doubt that defendant did, at the time and place
mentioned, make an assault upon the person of the prose-
cuting witness with the intent to inflict upon him bodily
injury, was misleading and erroneous."

The court said:

"The serious ground of complaint urged against this in-
tsruction by the appellant is that it directs the jury that
they should find the defendant guilty of an assault with
intent to commit murder if they found the assault was
committed with an intent simply to do bodily injury. The
defendant is charged with an assault with intent to mur-
der. In order to convict the defendant of the crime charged
in the indictment, it is necessary for the territory to estab-
lish two facts, viz., the assault and the intent; and, before
the jury can find the defendant guilty, they must find

that the defendant committed the assault, and that he did so with the intent to murder, as charged in the indictment. 'It is the intent unlawfully and maliciously to kill the person assaulted which constitutes the crime of assault with intent to murder.' Washington v. State, 53 .Ala. 29; Morgan v. State, 33 Ala. 413. 'In a prosecution for an assault with intent to murder, the actual intention to kill must be found.' Maher v. People, 10 Mich. 212 [81 Am. Dec. 781]; Roberts v. People, 19 Mich. 401; Jeff. v. State, 37 Miss. 321; Simpson v. State, 59 Ala. 10 [31 Am. Rep. 1]; State v. Stewart, 29 Mo. 419. In the indictment the defendant is charged with an assault with intent to murder. This instruction would authorize the jury to find the defendant guilty if they found from the evidence, beyond a reasonable doubt, that he made the assault with intent to inflict upon the person of Manuel Leyba a bodily injury. An assault with intent to murder is an entirely different charge from an assault with intent to maim or disfigure or commit bodily injury."

In Territory v. Baca, 11 N. M. 559, 71 P. 460, defendant was charged with the crime of assault with intent to murder, and we there said:

"The first instruction asked by the defendant and refused by the court, complained of, is as follows: 'If you believe that the defendant and the prosecuting witness Genaro Baca got into a fight and the defendant cut the witness Genaro Baca, without intent to do so, then you will find the defendant not guilty.' Section 1083, supra, provides: 'If any person shall assault another with intent to murder,' etc. Intent is one of the essential ingredients of the crime charged against the defendant. United States v. Buzzo, 18 Wall. 125, 21 L. Ed. 812; Territory v. Pino, 9 N. M. 598 [58 P. 393]; U. S. v. Folsom, 7 N. M. 532 [38 P. 70]; Territory v. Vigil, 8 N. M. 583 [45 P. 1117]. Therefore, if the defendant did what he is charged to have physically done, without any intent in fact, the defendant would not be guilty."

It was held error to refuse to give the instruction requested by the defendant.

As to whether the charge of assault with intent to murder or to kill is made out by evidence that the accused deliberately shoots at one person but misses him and wounds another, there is a conflict of authority. See 30 C. J. "Homicide," par. 167. That exact question has not been before this court. While we held in State v. Carpio, 27 N. M. 265, 199 P. 1112, 18 A. L. R. 914, that a charge that murder was done wilfully, deliberately, and premeditatedly, and of malice

aforethought is sustained by proof that it was committed with a mind imbued with these qualities, though they were directed against a person other than the one killed, and that, in a homicide case where A. shoots at B., and the bullet strikes C., and kills him, the malice or intent follows the bullet, still there is much authority for holding that the rule is different in statutory assault with intent to murder cases. In State v. Mulhall, 199 Mo. 202, 97 S. W. 583, 7 L. R. A. (N. S.) 630, 8 Ann. Cas. 781, it was held that under the Missouri statute a person who, while shooting with intent to kill another, wounds a third person at whom he does not shoot and whom he has no intention of killing, is not guilty of an assault with intent to kill the third person. This is a well-considered case wherein the precedents are collected. We will quote from the opinion in that case because what was there said illustrates the views we hereafter express, though we do not find it necessary to decide the exact point there presented:

"It will be observed that this charge is predicated upon that subdivision of the statute which provides that 'every person who shall on purpose and of malice aforethought shoot at * * * another with intent to kill.' In other words, the information charges that the defendant, Zach Mulhall, shot at Ernest Morgan with a pistol with the intent to kill him. It is clear that under that provision of the statute there are two essential elements necessary to constitute such offense: First, that the defendant shot at Ernest Morgan, and, second, that he did so with intent to kill him; and before conviction can be had upon this charge it is incumbent upon the state to establish by the proof both elements of such offense. It is not enough that the defendant shot at Ernest Morgan, but as well at the time of such shooting he intended to kill him. The fact that Ernest Morgan was seriously wounded, and such wound may have been occasioned by a shot from the pistol of the defendant, is not enough, for the fact that he was so wounded must not be confounded with the essential elements to constitute the offense with which he is charged. While the wound may be shown in evidence, and its character, for the purpose of establishing the essential elements of the crime, that is, that he shot at him with intent to kill, yet such wounding does not constitute any part of the offense. The charge of the offense is complete when it is alleged that the defendant shot at Ernest Morgan with a pistol with intent to kill him. As was said by Sherwood J., in State v. Agee, 68 Mo. 264, 'It is as much

an offense under the law to shoot at a man and miss him as to shoot at him and hit him.' While, as before stated, the wounding of Ernest Morgan was competent evidence for the jury to consider in determining the intent of the defendant, yet such wounding does not constitute any essential element of the offense, and unless such wounding was the result of the commission of the acts necessary to constitute such offense as defined by the statute, that is, there can be no conviction for an assault with intent to kill, that he shot at Ernest Morgan with the intent to kill him,

"The Supreme Court of California, in the case of People v. Keefer, 18 Cal. 636, clearly announced the principle applicable to the case at bar. In that case the defendant was indicted for an assault with intent to murder one John R. Evans, and convicted of the crime of an assault with a deadly weapon with intent to do great bodily harm. The trial court instructed the jury that if a loaded gun was presented within shooting range at Wilson or Evans, or at the dog, under circumstances not justified by the law, and under circumstances showing an abandoned and malignant heart, and that the gun was fired off and inflicted a dangerous wound upon the witness Evans, then the crime of an assault with a deadly weapon, with intent to inflict a bodily injury upon the witness Evans, has been proved; and it would only remain for them to inquire whether or not the defendant was guilty of the crime. The pertinency of this charge, as we gather from the case, was shown by proofs which conduced to prove that Keefer fired a gun in the direction of Wilson and Evans and of a dog near them, there being some dispute as to whether with the intent to kill or wound the dog or these men, or one of them. Baldwin J., who delivered the opinion of the court in that case, in discussing the correctness of the instructions of the trial court, said: 'It is true that a person may be convicted of murder of an assault, though no specific intent may have existed to commit the crime of murder or assault upon the person charged. The familiar illustration is that of a man shooting at one person and killing another. In these cases the general malice and the unlawful act are enough to constitute the offense. No doubt exists that a man may be guilty of manslaughter under some circumstances by his mere carelessness. But this rule has no application to a statutory offense like that of which the defendant was convicted. This is an assault with a deadly weapon, with intent to do great bodily harm to another person. The offense is not constituted in any part by the battery or wounding, but is complete by the assault, the weapon and the intent—as, if A. snaps a loaded pistol at B., within striking distance, the offense would be no more under this clause of the statute if the shot took effect. It could scarcely be contended, if a man shot at another's dog or chicken, when such shooting would be a trespass and wholly illegal, that the trespasser was guilty of this crime of assault upon a man with intent, etc., merely from the fact that the owner of the animal was

nearby and within range of the shot, or the shot went through his hat or clothes; and yet the reason for holding thus in that case is as great as in this. So, if a man carelessly handling bricks on the roof of a house should throw them on the street below, though he might be liable, civilly and criminally, for injury done to persons thereby, he could not be guilty of the statutory offense of assault with intent to kill. The words of the statute, 'with intent to do great bodily harm to a person' (Wood's Dig. 335), are not merely formal, but they are substantial—they constitute the very gravamen of the offense; and the statute, like all other penal laws, must be strictly construed. It is nothing in this view that the defendant is guilty of some crime, he must be guilty of the very crime charged, which cannot be unless the elements of the crime, as de-defined by the Legislature, appear. This is the universal rule applicable to criminal proceedings and it is as plainly supported by common sense as by technical law. We cannot make the proposition plainer by illustration.'

"So it may be said as to the case at bar. If the ce-fendant shot at Ernest Morgan with a pistol, with the intent to kill him, and missed him, the offense would be just as complete if such shot had taken effect; and on the other hand, if he did not shoot at him and did not intend to kill him, although he may have wounded him in the commission of some other unlawful act, there being an entire absence of the necessary elements of the ofense as defined by the statute, that is, that he shot at him with a pistol with the intent to kill him there could be no conviction of that statutory offense.

"The fundamental error assumed by the contention on the part of the state in this prosecution is the confounding of the purely statutory offense of an assault with intent to kill, which is defined by the statute to be the commission of certain acts with. a specific intent, with that line of cases where the party shoots at one man and kills another. There is no dispute as to the law applicable to cases where the party is killed. In those cases the common-law rules are strictly applied, and the text-writers and the rules announced by this court, as well as the courts in all other states where the question has been brought before them, are uniform in announcing that principle that 'where the party shoots at one man and kills another, malice will be implied as to the latter, and the felonious intent is transferred on the same ground as where poison is laid to destroy one person and taken by another,; and with the rules announced in the leading cases in this state upon that subject, State v. Payton, 90 Mo. 220, 2 S. W. 394; State v. Gilmore, 95 Mo. 554, 8 S. W. 359, 912; State v. Pollard, 139 Mo. 220, 40 S. W. 949; and State v. Clark, 147 Mo. 20, 47 S. W. 886, we are entirely satisfied. But, on the other hand, that there is a clear distinction between those cases where the common-law rules are most strictly applied, and the clearly defined statutory offense of an assault with intent to kill by shooting at another with a

pistol, with intent to kill, we have no doubt, and the appellate courts of the various states that have had this question before them and the question sharply presented and carefully considered by such courts have in no uncertain terms recognized such distinction.

"As was said by the California court in the Keefer Case, 'If a man carelessly handling bricks on the roof of a house should throw them into the street below, though he might be liable, civilly and criminally, for injury done to persons thereby, he could not be found guilty of the statutory offense of an assault with intent to kill.' No one, however, would' contend for a moment that, if the bricks thrown .from the house into the street should have killed an individual, the party could not have been charged with some grade of crime for causing the death of the individual. The offense with which the defendant in this case is charged is clearly defined by the statute, consisting of shooting at another with the intent to kill him, and he cannot be guilty of such offense unless the elements of the crime defined by the lawmaking power appear."

The defendant in the case at bar was asked the following questions by the assistant district attorney, and made answer thereto as follows:

"Q. This house of yours—it is in a town or settlement? A. I guess it is a town.

"Q. And this shooting you did, was that inside the town? A. It was at my home.

"Q. In that town? A. Yes, sir.

"Q. Quite a few people living down there? A. Yes, sir."

It was apparently the theory of the state at the trial that a person who promiscuously and recklessly discharges a firearm in a settlement is guilty of an unlawful act, and that therefore the jury was warranted in taking such unlawful conduct into consideration in determining the guilt or innocence of the accused of the charge of assault with intent to commit murder on Marcelino Padilla. The Attorney General in his brief says:

"It is presumed that a person intended the necessary, usual and actual result of his acts and surely, when a person promiscuously discharges a firearm in a settlement, as in the case at bar, it is presumed that there is an intent to kill or murder some one or any one who might happen to be in line of fire."

We are unable to give our assent to that position. A reckless act committed without regard to the life or safety of others and resulting in the death of another, may, under certain circumstances, constitute the crime of manslaughter, and under certain circumstances, if such act is sufficient to indicate a depraved mind regardless of human life resulting in the death of another, it may constitute murder, but it will not do in our judgment to say that such reckless shooting will constitute assault with intent to murder another, in the absence of a showing of a specific intent to take human life. The unlawful shooting of firearms within the limits of a settlement in this state is made a crime by section 1705 of the codification of 1915. But defendant was not charged with that crime, and it cannot be referred to in support of the conviction in the case at bar. That statute has no application to an assault with intent to commit murder. The statement sometimes appears in works of approved excellence to the effect that an unintentional homicide is a criminal offense when occasioned by a person engaged at the time in unlawful act. The sense in which the phrase "unlawful act" is used in this connection, however, is that such unlawful act must be one that is malum in se and not merely malum prohibitum. And this we hold to be the correct doctrine. The following interesting discussion is quoted from State v. Horton, 139 N. C. 588, 51 S. E. 945, 1 L. R. A. (N. S.) 991, 114 Am. St. Rep. 818, 4 Ann. Cas. 797;

"In Foster's Crown Law, it is thus stated at page 258: 'In order to bring a case within this description (excusable homicide) the act upon which death ensueth must be lawful. For if the act be unlawful, I mean if it be malum in se, the case will amount to felony, either murder or manslaughter, as circumstances may vary the nature of it. If it be done in prosecution of a felonious intent, it will be murder; but if the intent went no further than to commit a bare tresspass, it will be manslaughter.' At page 259, the same author puts an instance with his comments thereon as follows: 'A. shooteth at the poultry of B. and by accident killeth a man; if his intention was to steal the poultry, which must be collected from circumstances, it will b' murder by reason of that felonious intent, but if it was done wantonly and without that intenttion, it will be barely man-

slaughter. The rule I have laid down supposeth that the act from which death ensued was malum in se. For if it was barely malum prohibitum, as shooting at game by a person not qualified by statute law to keep or use a gun for that purpose, the case of a person so offending will fall under the same rule as that of a qualified man. For the statutes prohibiting the destruction of the game under certain penalties will not, in a question of this kind, enhance the accident beyond its intrinsic moment.'

"One of those disqualifying statutes here referred to as an instance of malum prohibitum was an act passed (13 Richard II, c. 13) to prevent certain classes of persons from keeping dogs, nets or engines to destroy game, etc., and the punishment imposed on conviction was one year's imprisonment. There were others imposing a lesser penalty.

"Bishop in his work, entitled New Criminal Law, vol. 1, § 332, treats of the matter as follows: 'In these cases of an unintended evil result, the intent whence the act accidentally sprang must probably be, if specific, to do a thing which is malum in se and not merely malum prohibitum.' Thus Archbold says: 'When a man in the execution of one act, by misfortune or chance and not designedly, does another act for which, if he had wilfully committed it, he would be liable to be punished—in that case, if the act he were doing were lawful or merely malum prohibitum, he shall not be punishable for the act arising from misfortune or chance, but if it be malum in se, it is otherwise. To illustrate: Since it is malum prohibitum, not malum in se, for an unauthorized person to kill game in England contrary to the statutes, if, in unlawfully shooting at game, he accidentally kills a man, it is no more criminal in him than if he were authorized. But, to shoot at another's fowls, wantonly or in sport, an act which is malum in se, though a civil trespass, and thereby accidentally to kill a human being is manslaughter. If the intent in the shooting were to commit larceny of the fowls, we have seen that it would be murder.' To same effect is Estell v. State, 51 N. J. Law, 182 [17 A. 118]; Com. v. Adams, 114 Mass. 323 [19 Am. Rep. 362]."

In State v. Adams, 24 N. M. 239, 173 P. 857 we held that the offense of discharging a pistol within the limits of a settlement under the statute prohibiting such acts was not an offense malum in se, but merely malum prohibitum. We there said:

"If a dwelling house is habitually occupied by people, and they should on the occasion of the discharge of the deadly weapon be absent from such house, no harm could possibly result to them from the commission of the act. The object to be subserved by the statute would not exist under such circumstances. The offense is not malum in se, but is malum prohibitum. There is nothing illegal or immoral in discharging a deadly weapon within 300 yards

of an inhabited house, and the same is an offense against the law simply because the statute so declares." •

In view of the apparent theory of the prosecution as indicated by the eliciting of testimony regarding the shooting of the firearm by defendant in a settlement, we think the court's instruction No. 8 dangerous, particularly in view of the fact that nowhere in the instruction is the jury told that the act of the defendant, in order to constitute the crime, must have been done with intent to take the life of Marcelino Padilla or at least with intent to take some human life.

The Case of Feagle v. State, 55 Fla. 13, 46 So. 182, involved the charge of an assault with a premeditated design to effect the death of another. The defendant was convicted, and the error assigned was the denial of the motion for a new trial. One ground of the motion urged error in the following instruction, which formed a part of the court's general charge, to wit:

.''And if you should find from the evidence that the defendant, Drew Feagle, assaulted David Haltiwanger with intent to perpetuate any act imminently dangerous to another and evincing a depraved mind regardless of human life although without any premeditated design to effect the death of any particular individual then you should find him guilty of an assault with intent to commit murder."

The court, considering this instruction said:

"This portion of the general charge is erroneous because it omits the requirements that there must have been, intent to kill on the part of the defendant, and only requires an intent to perpetuate any act imminently dangerous to another and evincing a depraved mind regardless of human life. This instruction erroneously permits the jury to find the defendant guilty of an assault with intent to commit murder upon proof that he assaulted Haltiwanger with intent to perpetrate any act imminently dangerous to another and evincing a depraved mind regardless of human life, instead of requiring proof that the accused committed the assault with intent to take life.

"Upon indictments for assault with intent to commit any of the grades or degrees of unlawful homicide, it is not sufficient to show that the killing, had it occurred, would have been unlawful and a felony; but it must be found that the accused committed the assault with intent to take life, in order to sustain a conviction for an assault with intent to commit a felony. Williams v. State, 41 Fla.

295, 26 So. 184; Knight v. State, 42 Fla. 546, 28 So. 759; Pyke v. State, 47 Fla. 93, 36 So. 577.

"In Knight v. State, supra, this court held: 'Where one assaults another with intent (but not a premeditated design) to kill him, and the assault is accomplished by an act, which, if death has resulted therefrom, would have constituted murder in the second degree, under statute defining this degree of homicide, the party committing the assault will be guilty of an assault with intent to commit the felony of murder in the second degree; but if there be no intent to kill, the party committing the assault cannot be convicted for an assault with intent to commit a felony, even though the circumstances are such that, had the party assaulted died, the party committing the assault would have been guilty of murder in the second degree'."

In the case of Knight v. State, 42 Fla. 546, 28 So. 759, quoted from, the Florida Supreme Court said:

"The following, among other instructions, were given by the court: 'If the jury find from the evidence, beyond a reasonable doubt, that the defendant, Wm. J. Knight, at any time within two years before the finding of the indictment in this case, shot one Ben Brown with a pistol, in Alachua county, Fla., from a premeditated design to effect the death of Ben Brown, or if the shooting was an act imminently dangerous to another, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, then the jury should convict the defendant as charged in the indictment.' The defendant excepted to this instruction as a whole, and to that portion thereof which reads as follows: 'If the shooting was an act imminently dangerous to another, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, then the jury should convict the defendant as charged in the indictment.' "

The court further said that the gist of the offense pronounced by the statute was an intent to commit a felony, and that the portion of the instruction objected to was erroneous in that it omitted the requirement that there must be an intent to kill.

In the case at bar the charge of the offense was complete when it was alleged that the defendant shot at Marcelino Padilla with intent to kill him. It would have been as much offense to shoot at him and miss him as to shoot at him and hit him. The fact that he was hit by a particle of an exploded and spent bullet is an evidentiary fact, but it is not an ingredient of

the offense. There is no direct evidence of the direction in which the gun was pointed when it was fired except that of the defendant. She says it was pointed at the ground in front of her, and that though she saw no persons distinctly she saw dim outlines of persons in front of her. One of the principle evidentiary facts relied upon by the state—that is, that a portion of the exploded bullet struck Padilla—seems to corroborate the defendant's statement that she fired into the ground and that the bullet struck a hard substance and broke up into fragments, one of them striking Padilla. The defendant says that she was firing into the ground to frighten away the people who were destroying her property. The testimony of the state's witnesses shows that her property was being destroyed, and there is no conflict in the testimony upon that subject, and there is no direct testimony adduced by the state to contradict the account given of the shooting and the direction in which the gun was pointed as given by the defendant. The circumstances may or may not contradict defendant's evidence. It has been said that the shooting of a firearm in close proximity to a person without pointing it at him or intending to harm him but with an intention to frighten him is not an assault. See Degenhardt v. Heller, 93 Wis. 662, 68 N. W. 411, 57 Am. St. Rep. 945; State v. Mills, 6 Pennewill (Del.) 497, 69 A. 841. Also the contrary has been held, but our attention has not been called to any case holding that so shooting a firearm to frighten merely would be an assault with intent to murder. Of course the jury would not be bound to believe what the defendant said, as the circumstances of a resulting battery might overcome the defendant's testimony. But the battery in this case, constituted as it was by the prosecuting witness being hit by a particle of a bullet which had exploded by striking some object either on the ground or elsewhere, is perhaps as much evidentiary value to corroborate the defendant's testimony as it is to support the state's case. In State v. Moran, 46 Kan. 318, 26 P. 754, it

was held, when defendant was charged with an assault with a deadly weapon (a pistol) with intent to kill, under the Kansas statute, that it was error to instruct the jury that he might be convicted of assault with intent to commit manslaughter, when the evidence tended to show that he shot the pistol into the ground with no intent to harm any one, and no one in fact was hurt or harmed.

We doubt the sufficiency of the evidence to sustain the conviction in this case, but, as the judgment must be reversed on other grounds it is not necessary to enter into an extended discussion of the testimony.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial; and it is so ordered.

PARKER, C. J., and WATSON, J., concur.