2005-NMSC-031

120 P.3d 447

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Scott Andrew REED, Defendant–Appellant.**

**No. 27,948.**

Supreme Court of New Mexico.

Aug. 17, 2005.

**368**

John B. Bigelow, Chief Public Defender, Vicki W. Zelle, Assistant Appellate Defender, Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, Elizabeth Blaisdell, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

BOSSON, Chief Justice.

{1} After a jury trial, Defendant Scott Reed was convicted of first-degree depraved mind murder, in violation of NMSA 1978, Section 30–2–1(A)(3) (1994), and sentenced to life in prison. In addition to two other charges not relevant to this appeal, Defendant was also convicted of negligent child abuse resulting in death contrary to NMSA 1978, Section 30–6–1 (2001, prior to 2004 amendment). Finding insufficient evidence, we reverse the conviction for first-degree depraved mind murder, but we affirm the conviction for child abuse resulting in death. Accordingly, we remand to the district court to vacate the conviction for depraved mind murder and adjust Defendant's sentence accordingly.

## BACKGROUND

{2} By all accounts, Defendant, who was 18 years old at the time, was good friends with David O'Brien, who was four years younger. Even though David's parents did not approve of Defendant or his 16–year–old brother, Jeff, David continued to spend time with them.

{3} On the morning of December 24, 2001, David went shopping with the two Reed brothers and their mother. After returning to the Reed residence, Jeff went to his bedroom to take a nap, while Defendant and David drove to the video store. Around 1 p.m., David called his mother and asked her not to come home because he was studying. She testified that she thought David was home when he called. When the two friends returned to the Reed residence, Defendant's parents were gone. Besides the three teenagers, the only other person home at the time was Defendant's grandmother, who was in a far corner bedroom. Suffering from dementia, the grandmother was unaware of the events that followed.

{4} Defendant testified that when he realized that his parents were not home, he retrieved a .38–caliber revolver from the trunk of his car and brought it into the house. He had purchased the revolver a couple of weeks earlier from a friend, but kept it hidden from his parents because guns were forbidden in the Reed residence. Defendant said that even though David knew he should be returning home, he decided to stay to watch a video in the living room. After the movie started, Defendant placed the unloaded revolver on the coffee table in front of the sofa.

{5} Jeff testified that he saw the gun on the coffee table when he joined David and his brother to watch the movie. Defendant was sitting in the middle of the sofa, with David sitting to his right in a recliner. Jeff lay down on the love seat to Defendant's left. Defendant testified that while watching the video he began playing with the unloaded revolver. He told the jury he pulled the trigger once and the hammer once. Jeff testified that he saw Defendant click the hammer back and let it go once or twice and heard the revolver click once or twice. Then he did not hear any clicking for a few minutes.

{6} According to Defendant, David got up to go into the kitchen for a snack. Meanwhile, Defendant removed a single bullet from his pocket and placed it in the revolver. Defendant testified that he looked down the barrel of the gun to make sure the bullet was not in the chamber. Viewed from the back of the gun, the bullet was immediately to the

right of the top cylinder in line with the firing pin, at a one o'clock position. Defendant told the jury he thought the gun was safe, and would not fire. He pointed the gun off to his side and pulled the trigger once. Defendant testified that he only meant to click the gun, and did not think it could fire. He claimed that because he was watching the television, he was not looking in the direction the gun was pointed, and did not know David had returned to the room. The gun discharged. As it turned out, the bullet had been placed in the exact position from which it would rotate into a firing position upon pulling the trigger. According to the autopsy, the bullet passed at a slight upward trajectory underneath David's left arm and struck him in the left side of his chest just below his nipple. It traveled through his body and lodged beneath his right arm without exiting.

{7} Jeff testified that he did not see Defendant shoot David, but was surprised when he heard the gunshot and covered himself with his arms. When Jeff looked up, he saw David crouching by the recliner before falling to the floor. Defendant testified that he was shocked that the gun went off, and that he panicked when he realized David had been shot. Defendant said he and Jeff tried to help David, and immediately called 911. Both spoke to the operator, but lied about what happened. Jeff claimed David was the victim of a drive-by shooting. Defendant said, "Somebody shot my friend." After hearing sirens, Defendant fled to his older brother's house with the gun. Crying and distraught, Defendant told his brother he accidentally shot David. Defendant then drove around trying to figure out what to do. He called his father on David's cell phone, which was in his jacket pocket, and told him the shooting was an accident. He also spoke on the phone with a police detective and admitted shooting David, but said it was an accident. Defendant drove to Springer, then returned to Albuquerque to go to the police. Even after the police told Jeff that Defendant had admitted shooting David, Jeff was hostile and continued to lie about the drive-by shooting. Meanwhile, David died from the gunshot wound.

{8} The State charged Defendant with an open count of murder. A jury trial began in October 2002. According to the State's main theory at trial, Defendant intentionally shot David after some sort of struggle. The State introduced evidence that David was shot one time in the chest, but that the shirt David was wearing had three holes at the back shoulder that did not line up with where the bullet entered his body. The State's attorney speculated that the shirt was bunched up because someone was holding David against his will. The State also pointed out that the recliner in which David had been sitting was found on its side in front of the television about ten feet from its original position, as if thrown in a fight.

{9} To contradict Defendant's claim that the shooting was an accident, the State introduced evidence to indicate Defendant was familiar with the revolver, and with guns in general. According to Defendant's own testimony, he had tested the revolver a couple of days earlier at a shooting range. Despite Defendant's claim that the revolver was sticking, and would not fire when a bullet was in the top chamber, the gun did discharge a couple of times. The State's tests revealed the revolver was working properly. Detective Zamora, the lead investigator, testified that the trigger on the revolver required a lot of pressure, making it difficult to pull unintentionally. In addition, Defendant's mother told police officers after the shooting that her sons liked guns. Cartridges from two different caliber weapons, not matching the revolver, were found in Jeff's bedroom.

{10} Much of the State's evidence, presented to support its theory of an intentional shooting, was ambiguous. Tests conducted on David's shirt indicated the shooting took place from four to ten feet away, and not at close range. Thus, if the shirt was bunched up, it was not from Defendant grabbing it. Detective Zamora testified that rescue personnel may have moved the recliner in order to attend to David. Testimony by the State's own witnesses tended to support Defendant's claim that he did not intend to shoot David. A detective testified that a lay person is easily confused about the direction a particu-

lar revolver rotates. The detective said he had investigated a lot of accidental shootings in which individuals mistakenly believed a revolver would not fire unless a cartridge was in the top position. On cross-examination, Detective Zamora said that he did not believe Defendant meant to shoot David, and that he had no evidence that the shooting was a willful and deliberate murder. He did testify, however, that he believed Defendant pointed the gun at David.

{11} At the close of the State's case, defense counsel asked for a directed verdict dismissing the first-degree murder charge because there was no evidence of deliberation. The State countered that it was for the jury to decide if the shooting was accidental. Then the State turned to the alternative theory of first-degree depraved mind murder.[1] The State argued that depraved mind murder was clear because loading a firearm and pointing it inside a room where others are present is an act greatly dangerous to the lives of others indicating a depraved mind without regard for others. The prosecutor said common sense dictates that even an eighteen-year-old should know how greatly dangerous it was to load a gun, click it, and point it in the house. The district court refused to direct a verdict on the first-degree murder charge. In closing remarks to the jury, the prosecutor argued "that whenever you add an idiot and a loaded firearm, what you have is depraved mind murder."

{12} The jury convicted Defendant on all counts, including first-degree murder and negligent child abuse resulting in death. The jury was told to consider both alternative theories of first-degree murder, but only returned a guilty verdict on depraved mind murder. Defendant was sentenced to life in prison.

## DISCUSSION

{13} On appeal, Defendant challenges his conviction for depraved mind murder based on insufficient evidence and fundamental er-ror in the jury instructions. In addition, Defendant challenges his conviction for negligent child abuse resulting in death, arguing that the Legislature only intended the crime to apply to persons in a position of authority over a child, and not to a child's friend. He argues in the alternative that the jury instructions for child abuse caused fundamental error. Finally, Defendant contends, and the State concedes, that if we affirm his first-degree depraved mind murder conviction, his conviction for child abuse would constitute double jeopardy and must be vacated.

## Sufficiency of the Evidence

{14} We first address Defendant's claim that there was insufficient evidence to support his conviction for depraved mind murder. Under a sufficiency of evidence analysis, we must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We must view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict. *Id.* It is this Court's duty on review to determine whether *any* rational jury could have found the essential facts to establish each element of the crime beyond a reasonable doubt. *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992).

### *Elements of Depraved Mind Murder*

{15} In New Mexico, first-degree murder is defined in three ways: (1) as a "willful, deliberate and premeditated killing"; (2) as a death caused "in the commission of or attempt to commit any felony"; and (3) as depraved mind murder. Section 30–2–1(A). Defendant was charged with an open count of murder and indicted for deliberate murder. The court submitted jury instructions on deliberate murder, and in the alternative,

1. The State charged Defendant with an open count of murder. A few weeks later, the grand jury indicted Defendant for first-degree murder (willful and deliberate), contrary to Section 30–2–1(A)(1), as well as the lesser included offenses, which were second-degree murder, contrary to

Section 30–2–1(B), and manslaughter, contrary to Section 30–2–3. According to the record, Defendant was never indicted for depraved mind murder, but did not object to the jury being instructed on depraved mind murder.

depraved mind murder. The court also submitted second-degree murder and involuntary manslaughter instructions as lesser included offenses. The jury did not convict Defendant of deliberate murder, but found him guilty of depraved mind murder. We focus, therefore, on whether the evidence is sufficient to establish that conviction.

{16} New Mexico is one of only a handful of states to classify depraved mind murder as first-degree murder. 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7, at 486 & n. 71 (2d ed.2003).[2] First-degree murder is a capital felony, punished by life imprisonment or death, our most severe criminal penalty. *See* NMSA 1978, § 31–18–14(A) (1993). In contrast, second-degree murder carries a basic sentence of fifteen years imprisonment, and involuntary manslaughter only eighteen months. *See* NMSA 1978, § 31–18–15(A)(2) to (6) (2003). In this case, Defendant was sentenced to life imprisonment.

{17} Given the extreme differences in punishment, this Court has previously underscored the importance of distinguishing first-degree depraved mind murder from second-degree murder in New Mexico. *State v. Brown*, 1996–NMSC–073, ¶ 13, 122 N.M. 724, 931 P.2d 69. Not only are clear distinctions necessary for the administration of our criminal justice system, they are vital to an accused facing an open charge of murder. *See Garcia*, 114 N.M. at 272, 837 P.2d at 865. First-degree murder is reserved for those killings that are the most heinous, and which deserve the most serious punishment, as opposed to those which, intentional or not, "lack the gravity associated with first degree murders." *Id.*

{18} Despite the importance of construing the first-degree murder statute to punish only the most reprehensible homicides, our courts continue to struggle with making clear distinctions concerning depraved mind murder. *See Brown*, 122 N.M. at 734, 931 P.2d at 79 (Minzner, J., dissenting) (observing that this Court has produced "the thinnest of distinctions between depraved-mind murder and second-degree murder"); *cf. Garcia*, 114 N.M. at 272, 837 P.2d at 865 (acknowledging that the appellate courts "have not been especially helpful in distinguishing first degree murder from second degree murder"). *See generally* Leo M. Romero, *Unintentional Homicides Caused by Risk–Creating Conduct: Problems in Distinguishing Between Depraved Mind Murder, Second Degree Murder, Involuntary Manslaughter, and Noncriminal Homicide in New Mexico*, 20 N.M. L.Rev. 55, 60 (1990) (stating that our courts and jury instructions have not been particularly helpful in clarifying the distinctions between different degrees of unintentional homicide).

{19} A comparison of the jury instructions in Defendant's case illustrates those "thinnest of distinctions" between depraved mind murder and second-degree murder. To convict Defendant of depraved mind murder, the State was required to show, either through direct or circumstantial evidence, that Defendant killed David without justification or excuse "by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." *See* § 30–2–1(A)(3). The statute itself does not define the mens rea, or state of mind, required for depraved mind murder. *See* § 30–2–1(A). However, the jury instruction for depraved mind murder required the jury to find:

1. The defendant *shot and killed* David O'Brien;

2. The defendant's act caused the death of David O'Brien;

---

2. *See* Colo.Rev.Stat. Ann. § 18–3–102(1)(d) (West 2004) (providing that a person commits the crime of murder in the first degree if: "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally, he knowingly engages in conduct which creates a grave risk of death to a person, or persons, other than himself, and thereby causes the death of another"); Me. Rev.Stat. Ann. 17–A, § 201(1)(B) (West 2004) (providing that a person is guilty of murder if the person "[e]ngages in conduct that manifests a depraved indifference to the value of human life and that in fact causes the death of another human being"); Wash. Rev.Code Ann. § 9A.32.030(1)(b) (West 2005) (providing that a person is guilty of murder in the first degree when: "[u]nder circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person").

3. The act of the defendant was greatly dangerous to the lives of others, *indicating a depraved mind without regard for human life;*

4. *The defendant knew that defendant's act was greatly dangerous to the lives of others;*

5. This happened in New Mexico on or about the 24th day of December 2001.

*See* UJI 14–203 NMRA 2005 (emphasis added).

{20} In contrast, a person who kills another commits murder in the *second* degree, "if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another." *See* § 30–2–1(B). The second-degree murder instruction directed the jury to find:

1. The defendant *killed* David O'Brien;

2. *The defendant knew that his acts created a strong probability of death or great bodily harm to David O'Brien or any other human being;*

3. This happened in New Mexico on or about the 24th day of December 2001.

*See* UJI 14–210 NMRA 2005 (emphasis added).

■ {21} As can readily be seen by comparing the two instructions, the elements describing knowledge and degree of risk are almost indistinguishable. Both require "an intent to kill or an intent to do an act greatly dangerous to the lives of others or with knowledge that the act creates a strong probability of death or great bodily harm." *State v. Ortega,* 112 N.M. 554, 565, 817 P.2d 1196, 1207 (1991). The sole difference rests with the requirement in the depraved mind murder instruction that the jury find Defendant's act indicated a depraved mind without regard for human life, for which the jury receives no further definition or guidance.

{22} The lack of clear-cut distinctions between varying degrees of homicide has been problematic. Section 30–2–1(A)(3) requires "an act greatly dangerous to the lives of others." Without more specific guidance from the Legislature, one way our courts have distinguished depraved mind murder is by the number of persons exposed to danger by a defendant's extremely reckless behavior. *See Brown,* 1996–NMSC–073, ¶ 14 (observing that the number of persons subjected to the risk of death provides a factor in assessing the degree of risk disregarded). In general, our depraved mind murder convictions have been limited to acts that are dangerous to more than one person. *See State v. Sena,* 99 N.M. 272, 274, 657 P.2d 128, 130 (1983); *State v. DeSantos,* 89 N.M. 458, 461, 553 P.2d 1265, 1268 (1976); *see also* UJI 14–203 Committee Commentary. Quintessential examples include shooting into a crowd, placing a bomb in a public place, or similar acts of terrorism. *See State v. Johnson,* 103 N.M. 364, 368, 707 P.2d 1174, 1178 (Ct.App.1985).

■ {23} In addition to the number of people endangered, this Court has construed depraved mind murder as requiring proof that the defendant had "subjective knowledge" that his act was greatly dangerous to the lives of others. *See State v. McCrary,* 100 N.M. 671, 673, 675 P.2d 120, 122 (1984). The requirement of subjective knowledge serves as proof that the accused "acted with 'a depraved mind' or 'wicked or malignant heart' and with utter disregard for human life." *Brown,* 1996–NMSC–073, ¶ 16. Obviously, mere negligence or recklessness will not do.

■ {24} To further narrow the class of killings eligible for depraved mind murder, this Court has concluded "that the legislature intended the offense of depraved mind murder to encompass an intensified malice or evil intent." *Brown,* 1996–NMSC–073, ¶ 15. In describing that intensified malice, we have defined the phrase "depraved mind" used in the statute and uniform jury instructions as "[a] corrupt, perverted, or immoral state of mind constituting the highest grade of malice [that equates] with malice in the commonly understood sense of ill will, hatred, spite or evil intent." *Id.* ¶ 16 (internal quotations omitted); *cf.* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law,* 60 (3d ed.1982) (suggesting that one way to distinguish depraved mind murder from manslaughter when an underlying act involves extremely reckless conduct is by identifying an element of vi-

ciousness—an extreme indifference to the value of human life—in "the intent to do an act in wanton and wilful disregard of the obvious likelihood of causing death"). Depraved mind murder, therefore, requires outrageously reckless conduct performed with a depraved kind of wantonness or total indifference for the value of human life. *See State v. Ibn Omar–Muhammad,* 102 N.M. 274, 278, 694 P.2d 922, 926 (1985); *Johnson,* 103 N.M. at 368, 707 P.2d at 1178.

*In Light of these Qualifiers the Evidence Does Not Support Conviction for Depraved Mind Murder*

{25} We now inquire whether the State produced sufficient evidence to enable a rational juror to find the facts necessary to support Defendant's conviction for depraved mind murder. Before doing so, we observe that depraved mind murder is not a substitute for deliberate intent murder; it is not a fallback position available whenever the State fails to prove deliberation. *See People v. Roe,* 74 N.Y.2d 20, 544 N.Y.S.2d 297, 542 N.E.2d 610, 619 (1989) (Bellacosa, J., dissenting) (warning that depraved indifference murder should not provide prosecutors with an unjust double opportunity for a top count murder conviction). A person is guilty of deliberate murder when that person has a specific intent to kill another person that was "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14–201 NMRA 2005. In contrast, a person guilty of depraved mind murder may not intend the specific result of death, but is equally culpable because that person intentionally commits "an act imminently dangerous to others" or does so "with the subjective knowledge that the act creates a very high degree of risk to the lives of others, indicating a depraved mind regard-

less of human life." *Brown,* 1996–NMSC–073, ¶ 25. Rather than subjectively intend to commit murder, the accused must subjectively intend to commit an act that has a great likelihood of resulting in death. Thus, depraved mind murder involves an intentional act without regard for consequences.

{26} The jury did not find Defendant guilty of deliberate murder but found Defendant guilty of depraved mind murder. We may conclude from the verdict that the jury determined Defendant did not act deliberately but rather acted recklessly. To affirm the first-degree murder conviction, we must be assured that the jury understood that depraved mind murder was not a default charge requiring less evidence. Depraved mind murder carries a heavy but different evidentiary burden. The State must prove beyond a reasonable doubt that Defendant knew his act was greatly dangerous to the lives of others, and that Defendant's act was greatly dangerous to the lives of others indicating a depraved mind without regard for human life. *See* UJI 14–203.

{27} Defendant argues that he did not have the requisite knowledge for either depraved mind murder or second-degree murder because he did not think the gun would fire when he pulled the trigger. Defendant testified that when he put a bullet in the revolver, he checked to make sure it was not in the firing position. He claims he did not think the gun would fire without a bullet in the top chamber and was absent-mindedly playing with the gun when he pulled the trigger. He further contends that he was not looking in David's direction, and did not know David or anyone else was in the line of fire. If Defendant's story is to be believed, he did not know his act was greatly dangerous to the lives of others, and he did not act under circumstances indicating a depraved mind.[3]

---

3. We note in this case that the jury instruction describing the act required for depraved mind murder was flawed. The instruction simply required the jury to find "defendant shot and killed David O'Brien." Not much distinguishes this phrase from the act described in the jury instruction for second-degree murder: "defendant *killed* David O'Brien." In other attempts to convict a defendant for depraved mind murder in New Mexico, the act was described in more detail.

*See, e.g., State v. Hernandez,* 117 N.M. 497, 498, 873 P.2d 243, 244 (1994) (describing the act as "defendant fired a rifle at a group of people"); *State v. Ibn Omar–Muhammad,* 102 N.M. 274, 276, 694 P.2d 922, 924 (1985) (describing the act as "defendant intentionally drove a motor vehicle at a high rate of speed into a police roadblock"). Because the act was described so generally in Defendant's case, the instruction fails to indicate the circumstances the jury found that evinced a

{28} However, the State introduced evidence that Defendant was familiar with firearms in general, and with this one in particular, because he had recently tested it. Even though Defendant claimed that he did not understand the way the gun worked, and that he only thought it could fire with a bullet in the top chamber, at the very least he knew the gun could fire. Thus, in the State's view, Defendant took an extremely dangerous risk putting a bullet in a revolver, which Defendant thought was misfiring, and pointing that revolver at David and pulling the trigger.

{29} We do not disagree with the State that putting a bullet in a gun and pulling the trigger is extremely, even outrageously, reckless when other people are in the vicinity. If recklessness were all the State had to prove, though, to obtain a conviction for first-degree murder, there would be little principled distinction between depraved mind murder and second-degree murder. *See Brown,* 1996–NMSC–073, ¶ 14 (observing that the "major distinction between the two degrees of murder is based upon the culpable mental state required by the two offenses").

{30} In fact, the State argued a theory of depraved mind murder before the jury that was inadequate as a matter of law. At the close of the case, the prosecutor argued that any idiot and a loaded gun was depraved mind murder and that "stupidity is reckless disregard per se." Thus, the State improperly argued that reckless disregard would be sufficient to prove depraved mind murder. As we have seen, depraved mind murder requires proof beyond a reasonable doubt of additional elements, that Defendant knew his act was greatly dangerous to the lives of others, and that he performed his act under circumstances indicating a depraved mind.

{31} In most depraved mind murder cases, the facts make it obvious that those accused knew their acts were greatly dangerous to the lives of others, and that they consciously disregarded that risk in a way that manifested extreme indifference. *See*

LaFave, *supra,* § 14.4(b), at 443. Acts of terrorism and drive-by shootings provide clear examples of the type of gravity and depravity required. Planting a bomb in an airport, for example, is murder when death results, even if the intention is only to destroy property. *See* Perkins & Boyce, *supra,* at 60.

{32} Unlike these paradigms of depraved mind murder, the circumstances in which Defendant fired a bullet and killed David do not lend themselves to one obvious conclusion, that Defendant knew he was taking a grave risk with respect to everyone in the living room and therefore committed a depraved act. As we have noted, discharging a firearm in an occupied room is certainly reckless behavior. But an unintentional killing that results from such behavior has the potential to be any one of first-degree murder, second-degree murder, or involuntary manslaughter.

{33} In the few New Mexico cases in which we have affirmed depraved mind murder convictions involving the discharge of firearms, the defendant either admitted, or witnesses testified, that the defendant intentionally fired a weapon under circumstances showing an extreme degree of recklessness. *See, e.g., State v. Trujillo,* 2002–NMSC–005, ¶ 3, 131 N.M. 709, 42 P.3d 814 (shooting several times from a balcony of an apartment building into a crowd, killing a rival gang member); *McCrary,* 100 N.M. at 672, 675 P.2d at 121 (moving slowly around tractor-trailers parked overnight at a fairground with multiple firearms, shooting twenty-five times into the cabs, and killing a woman in a sleeping compartment); *Sena,* 99 N.M. at 273, 657 P.2d at 129 (firing four or five times into a crowded bar, killing a bystander). In each instance, there was no question that the defendant acted intentionally in firing the weapon. In each instance, the shooting was prolonged and repetitive. In each instance, therefore, the defendant clearly exhibited the type of extreme recklessness from which a jury could infer the defendant acted with a

depraved mind. Thus, we have no way of knowing on what facts the jury based its findings that Defendant's conduct indicated a depraved mind. While this error could be considered fundamental, despite the failure to object, we need not reach that analysis if we find there is insufficient evidence to support a verdict of depraved mind murder under any view of the evidence.

depraved mind without regard for the lives of others.

{34} In addition, the defendants in these cases acted with a degree of animosity, which gave the jury additional facts to support findings that the defendants' actions indicated a depraved mind and that the defendants knew that their acts were greatly dangerous to the lives of others. In *Trujillo*, the killing took place during an argument with rival gang members. 2002–NMSC–005, ¶ 3, 131 N.M. 709, 42 P.3d 814. In *McCrary*, the defendant and his friends felt cheated by carnival operators and sought revenge. 100 N.M. at 672, 675 P.2d at 121. In *Sena*, the defendant tried to shoot the doorman after being maced and thrown out of a bar, but instead hit someone else. 99 N.M. at 273, 657 P.2d at 129. Thus, the jury could determine from the evidence that the defendant in fact knew he was engaging in extremely reckless conduct aimed at human life in general with a depraved kind of wantonness.

{35} In these previous cases, even when a defendant claimed to have been unaware that his outrageous conduct exposed others to the extreme risk of death, substantial evidence existed to contradict that claim. In *McCrary*, for example, the defendant said that he did not know anyone was in the sleeper compartments of the trucks, and thus he was not subjectively aware that his conduct was greatly dangerous to the lives of others. 100 N.M. at 672, 675 P.2d at 121. He claimed he did not intend to hurt anyone because he only meant to shoot the tires of the truck. However, the evidence gave the jury a strong reason to reject the defendant's story. Not one single tire was shot, and there were twenty-five bullet holes in the upper parts of the trucks. *Id.* at 673, 675 P.2d at 122. In addition, testimony indicated that the defendant chose to use firearms instead of slashing the tires for fear of being caught, which indicated he knew that people were in the area. *Id.* As a result, in *McCrary*, there was reasonable support in the evidence for the jury to find the defendant knew his act was greatly dangerous to the lives of others.

{36} The case before us stands in contrast. The State contended at trial that Defendant loaded his revolver and intentionally pointed it at David from a distance of a few feet away. Even if we accept that the jury could infer from the evidence that Defendant intentionally pointed his gun at David with the knowledge that the gun could fire, these circumstances without other evidence could only support a charge that Defendant intended to kill David (deliberate intent murder) or intended to commit an act that created a strong probability of death or great bodily harm to David (second-degree murder) but not to others as well. We know that the jury did not find an express intent to kill. But if Defendant's actions were intentionally directed at David alone, then absent good reason for departing from our previous interpretation of the statute, he cannot be convicted of depraved mind murder. Thus far, we have limited depraved mind murder convictions to acts that are dangerous to more than one person. *See DeSantos*, 89 N.M. at 461, 553 P.2d at 1268 (holding that killing an individual with a cement block certainly is the work of a depraved mind, but would not be depraved mind murder because our statute "has been limited to reckless acts in disregard of human life in general"). This interpretation seems consistent with the language of the statute and the jury instructions. *See* § 30–2–1(A)(3) (requiring "any act greatly dangerous to the lives of others"); UJI 14–203 (requiring defendant's act to be greatly dangerous "to the lives of others" indicating a depraved mind without regard for human life and knowledge that the act was greatly dangerous "to the lives of others").

{37} We acknowledge, as the dissent points out, that other jurisdictions allow convictions for depraved mind murder when only one individual is put at risk. *See* 2 LaFave, *supra*, § 14.4(a), at 440. In some of those jurisdictions, we note, the legislature clearly indicated the statute applies to individuals. *See, e.g.,* Colo.Rev.Stat. Ann. § 18–3–102(1)(d) (requiring defendant to knowingly engage "in conduct which creates a grave risk of death *to a person, or persons,* other than himself, and thereby causes the death of another") (emphasis added); Wash. Rev. Code Ann. § 9A.32.030(1)(b) (requiring "conduct which creates a grave risk of death *to*

*any person,* and thereby causes the death of a person" (emphasis added)). Absent a specific indication from the Legislature, we will not broaden our construction of the statute to expand the crime of depraved mind murder and further blur the lines between first- and second-degree murder.[4]

{38} The State argues that the presence of Defendant's brother and grandmother make Defendant's conduct eligible for depraved mind murder because more than one person was placed in peril. However, if we accept the State's position that Defendant intentionally pointed the revolver at David, no evidence supports the contention that more than one person was placed in danger. No facts support the inference that Defendant loaded his revolver with more than one bullet or pulled the trigger more than once while the bullet was in the revolver. Neither is there evidence that Defendant pointed the gun around the room with reckless abandon, in a threatening manner, or as part of some game of chance with the occupants of the room. Defendant's brother was lying 180 degrees from where the gun was pointed. There is no dispute in the evidence on this point. Defendant's grandmother was in a bedroom on the other side of the house, some distance *behind* Defendant, and not in the direction the gun was pointed. The evidence is undisputed on this point as well. As a result, Defendant's conviction lacks the evidence needed to establish extreme indifference to human life in general.

{39} Notably, the circumstances of this case differ from the situation in *Sena,* in which the defendant's actions of firing several times into a crowded bar, though directed at one individual, placed everyone in the bar directly in danger. 99 N.M. at 273, 657 P.2d at 129. As previously noted, firing a bullet into a room the defendant knows to be occupied is often cited as an example of depraved mind murder. *See* LaFave, *supra,* § 14.4, at 440. But it is not simply the presence of others that elevates a death caused by a firearm to the level of depraved mind murder. In addition to requiring that other people be in the line of fire, *Sena* is consistent with courts in other jurisdictions that have required particularly egregious facts to sustain convictions, such as repeated and indiscriminate firing of a weapon despite knowing that others are in harm's way. It is those type of facts that indicate a depraved mind without regard for human life.

{40} For example, in *People v. Jernatowski,* 238 N.Y. 188, 144 N.E. 497 (1924), which LaFave cites, the court affirmed a jury verdict finding the defendant guilty of depraved mind murder for firing several shots into a house at night and killing a woman standing near the window. Beyond showing an extremely reckless act, the evidence showed the defendant was aware of the risk his conduct posed to others, yet callously disregarded that risk. There were lights on in the house, and the victim yelled at defendant

---

4. Even if we ignored the general rule in New Mexico that depraved mind murder involves an act endangering more than one person, we do not agree with the dissent that the jury could properly infer from the evidence that Defendant was playing some form of Russian roulette. While playing a macabre game of chance with a firearm may be a classic example of an act indicating a depraved mind, other jurisdictions have required more evidence in affirming murder convictions where it appeared the defendants were playing Russian roulette. *See, e.g., State v. Boyce,* 718 A.2d 1097 (Me.1998) (affirming depraved indifference murder after defendant shot victim in the head at point blank range during a drunken approximation of Russian roulette in which he impulsively and carelessly fired a pistol thirty times inside his house in the presence of many other people); *State v. Tanguay,* 574 A.2d 1359, 1361 (Me.1990) (affirming second-degree murder depraved indifference murder based on testimony that the defendant and victim pushed a

gun back and forth before defendant picked it up, rolled the cylinder, which defendant knew contained two bullets, laughed, and fired the gun at the victim); *People v. Roe,* 74 N.Y.2d 20, 544 N.Y.S.2d 297, 542 N.E.2d 610 (1989) (affirming second-degree depraved indifference murder where 15–year–old defendant loaded a mix of live and dummy shells at random into a 12–gauge shotgun, pumped a shell into the firing chamber, pointed it directly at a 13–year–old victim, exclaimed, "Let's play Polish roulette," and pulled the trigger); *Commonwealth v. Malone,* 354 Pa. 180, 47 A.2d 445 (1946) (affirming conviction for second-degree murder where 17–year–old defendant placed a cartridge in the chamber of a .32–caliber revolver, suggested they play Russian poker, placed the gun against his 13–year–old friend's side, and pulled the trigger three times). Unlike these cases, the jury had no testimony or evidence that Defendant was either playing a game or trying to scare David by pointing the gun at him.

to go away. The evidence also demonstrated that the defendant was part of a threatening gang, and bore a vicious animosity toward the victim's husband. *Id.*[5]

{41} As cases like *Jernatowski* indicate, in most convictions for depraved mind murder, the jury can account for the high level of culpability required for first-degree murder by looking at a defendant's conduct in light of the external facts known to the defendant. If a defendant's conduct is egregious enough, the jury can infer an element of wantonness and a subjective awareness of a high degree of risk. *See* Perkins & Boyce, *supra*, at 60.

{42} Under the right circumstances, a jury might reasonably find that firing a bullet into a room the defendant knows to be occupied would be depraved mind murder. In this case, however, the facts do not speak of these elements. In Defendant's case, pointing a gun at David without justification and discharging it from four to ten feet away might permit a jury to conclude Defendant committed a "depraved" act; this is virtually a knowing homicide. But without expanding our statutory construction of depraved mind murder, this act directed at David alone can only be deliberate murder or second-degree murder according to Section 30–2–1(A)(3) and our case law. *See DeSantos,* 89 N.M. at 461, 553 P.2d at 1268. The State did not present evidence that would allow the jury to conclude that Defendant's actions indicated a depraved mind with respect to human life in general. If we affirmed a conviction on these facts, then any time a person recklessly mishandles a firearm in the presence of another and shoots someone by accident, the accused can be charged with depraved mind murder.

{43} In a case like this, in which the circumstances alone do not manifest a depraved indifference to human life, there must be some circumstances showing malevolence or indifference other than the doing of a wrongful act. *See People v. Goecke,* 457

Mich. 442, 579 N.W.2d 868, 885 (1998) (Kelly, J., concurring in part and dissenting in part). A proper understanding of depraved mind as used in our murder statute is that a "conscious endangering of human life springing from such total indifference is a more blameworthy choice than 'mere recklessness alone which has had an incidental tragic result.' " *See* Bernard E. Gegan, *More Cases of Depraved Mind Murder: The Problem of Mens Rea,* 64 St. John's L.Rev. 429, 436 (1990) (quoted authority omitted).

{44} We are not persuaded that the State carried its evidentiary burden beyond a reasonable doubt that Defendant's conduct rose to the extreme level of depravity reserved for first-degree murder. We hold, therefore, that there is insufficient evidence to support the verdict that Defendant committed an act greatly dangerous to the lives of others, indicating a depraved mind in disregard of human life.

## Jury Instructions

{45} Even though it is unnecessary to the disposition of his case, Defendant raises a valid concern with respect to the uniform jury instructions. Defendant argues that "depraved mind" needs to be defined for the jury. The State responds that the term is easily understood, and "clearly indicates a state of mind beyond thoughtlessness or stupidity, a state of mind that encompasses a total disregard of human life." The opinions of this Court tend to disprove the State's position. In reviewing depraved mind murder convictions, we constantly provide various detailed definitions of depraved mind. *See, e.g., Brown,* 1996–NMSC–073, ¶ 16 (defining depraved mind as " '[a] corrupt, perverted, or immoral state of mind' constituting 'the highest grade of malice ... equatable with malice in the commonly understood sense of ill will, hatred, spite or evil intent' ") (quoted authority omitted); *State v. Hernan-*

---

5. *See also State v. Michaud,* 513 A.2d 842 (Me. 1986) (affirming depraved indifference murder conviction for killing a child when defendant, after fighting all evening with his girlfriend and threatening to kill her, purposefully fired two shots from a shotgun into a house while aware that seven people were inside); *People v. Register,* 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d

704 (1983) (affirming depraved indifference murder conviction for defendant who arrived at a crowded bar with a loaded handgun, drank continuously for several hours, announced several times that he was going to kill someone that night, then fired three times at various patrons, killing one and injuring two).

*dez,* 117 N.M. 497, 499, 873 P.2d 243, 245 (1994) (requiring "a wicked and malignant heart"); *Johnson,* 103 N.M. at 368, 707 P.2d at 1178 (stating that the act must be performed with a "depraved kind of wantonness"). This Court evokes these definitions for guidance every time we analyze the sufficiency of evidence to sustain a verdict for depraved mind murder. If we find the definitions from our case law so crucial in enabling us to identify the most blameworthy crimes, we cannot quarrel with Defendant's claim that such standards would be helpful and perhaps indispensable to a lay jury undertaking the same job.

{46} We direct the UJI Criminal Committee to consider whether an instruction can be formulated that helps the jury understand the function of the phrase "depraved mind." Such consideration should address whether the term requires further definition. *Cf. State v. Magby,* 1998–NMSC–042, ¶ 22, 126 N.M. 361, 969 P.2d 965 (directing the committee to modify the uniform jury instructions for child abuse resulting in death to include a definition of "reckless disregard" in order to adequately define the requirement of criminal negligence) *overruled on other grounds by State v. Mascareñas,* 2000–NMSC–017, ¶ 27, 129 N.M. 230, 4 P.3d 1221.[6]

## Child Abuse ·

{47} Having reversed the conviction for first-degree depraved mind murder, we could remand this case to the district court for a new trial on the lesser included offenses of first-degree murder: second-degree murder and involuntary manslaughter. However, in order to determine whether retrial is legally possible, we must first consider the viability of the child abuse conviction.

*Statute Does Not Require a Special Relationship*

{48} Defendant contends that our child abuse statute only applies to situations in which an adult, such as a parent or guardian, has a special relationship with a child. Because Defendant and the victim were only friends and contemporaries, Defendant argues that there is insufficient evidence to support his conviction for child abuse.

{49} Defendant is correct that three subsections of the child abuse statute include the specific language of parent, guardian or custodian. *See* § 30–6–1(A), –1(B), and –1(C). However, the Legislature does not use those terms in Subsection D, which states that child abuse "consists of a *person* knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health." Section 30–6–1(D) (emphasis added). "[W]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Rivera,* 2004–NMSC–001, ¶ 10, 134 N.M. 768, 82 P.3d 939 (quoted authority omitted).

{50} The Legislature has not indicated that the statute for negligent child abuse resulting in death is restricted to persons having a special relationship with the child, such as a parent or guardian. *See* § 30–6–1(D). Our courts have held that the statute applies to any person who causes or permits a child to be placed in a situation that endan-

---

**6.** We agree with the dissent that changes to our jury instructions should be more sweeping in order to clarify the distinctions between the various degrees of murder. Adopting the language of the Model Penal Code may offer a promising start, but we decline to suggest such a change primarily because we are constrained by the language of the statute. In addition, replacing "depraved mind" with the phrase "indicating an extreme indifference to the value of human life" would fail to clarify the differences between first-degree murder and manslaughter, for example, unless the jury instructions for manslaughter were changed. *See* Romero, *supra,* at 80–86 (suggesting comprehensive changes to the stat-

utes and uniform jury instructions for all degrees of unintentional homicide). As the drafters of the Model Penal Code made clear in refusing to further define the extreme indifference required for murder: "It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter." Model Penal Code § 210.2 cmt. 4, at 21–22 (1980). Without changes throughout our jury instructions, the distinction between murder and manslaughter would remain unclear.

gers the child's life. *See State v. Lujan*, 103 N.M. 667, 667, 669, 712 P.2d 13, 13, 15 (Ct. App.1985) (affirming conviction for child abuse after defendant chased a family in a pickup truck while his friends threw beer bottles and cans, one of which struck an infant's head). Reading the statutory language to apply to all adults, regardless of the relationship, appears consistent with the legislative intent to protect children from abuse. *See State v. Santillanes*, 2001–NMSC–018, ¶ 24, 130 N.M. 464, 27 P.3d 456 (stating that purpose of statute is to expand protection for children who are more vulnerable than adults).

{51} Defendant was an 18–year–old adult who shot a 14–year–old child. Unless the Legislature expressly states otherwise, Defendant's friendship with the victim does not excuse his conduct. We acknowledge Defendant's argument that a strict application of this statute can lead to absurd results, such as when two friends are separated in age by only a couple of days. However, those facts are not before us. Therefore, we reject Defendant's argument that the child abuse statute does not apply to him.

*Child Abuse Jury Instructions*

{52} Defendant also challenges the jury instructions for child abuse. Even though an outdated instruction was given, Defendant did not object or tender different instructions. Therefore, we review for fundamental error. *See* Rule 12–216(B)(2) NMRA 2005; *State v. Sosa*, 1997–NMSC–032, ¶ 23, 123 N.M. 564, 943 P.2d 1017. The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice. *State v. Jett*, 111 N.M. 309, 314, 805 P.2d 78, 83 (1991). Error that is fundamental "must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive." *State v. Garcia*, 46 N.M. 302, 309, 128 P.2d 459, 462 (1942).

{53} Defendant argues and the State concedes that the district court gave the jury the former elements instruction for child abuse, rather than the new one. Under the old instruction, the jury was required to find that Defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child. *See* UJI 14–602 NMRA 1999. Under the new instruction, the jury is required to find that Defendant acted with reckless disregard, which means the jury must find that Defendant knew or should have known his actions created a substantial and foreseeable risk, that Defendant disregarded that risk and was wholly indifferent to the consequences and to the welfare and safety of the child. *See* UJI 14–602 NMRA 2005.

{54} In *Mascareñas*, this Court was concerned that the jury could have applied an ordinary negligence standard rather than a criminal negligence standard because the terms "negligence" and "reckless disregard" were used in the same element without clarifying the difference. 2000–NMSC–017, ¶¶ 12–13, 129 N.M. 230, 4 P.3d 1221. A similar mistake occurred in Defendant's case. The jury was instructed, "To find that [Defendant] negligently caused child abuse to occur, you must find that [Defendant] knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of David O'Brien." As in *Mascareñas*, we acknowledge the potential for juror confusion.

{55} Under a fundamental error analysis, however, we consider any possible confusion in the context of jury instructions as a whole. *See State v. Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176. The State argues that this situation differs from *Mascareñas* because the jury here was given a definitional instruction of "reckless disregard" stating that "[f]or you to find the defendant acted with reckless disregard in this case, you must find that the defendant acted with willful disregard of the rights or safety o[f] others and in a manner which endangered any person or property." The State contends that this definitional instruction adequately corrected the omission of the definition of "reckless disregard" in the elements instruction.

{56} Ordinarily, we would agree with the State and conclude that the definition cor-

rected any potential for juror confusion. Only the child abuse instruction referred to "reckless disregard," and we would presume that the jury would understand the connection regardless of the order in which the jury instructions were read. However, because the possibility exists that the jury read the reckless disregard instruction in the context of the other instructions for homicide, we cannot assume that the misplaced definition corrected any potential for juror confusion. Thus, we conclude that the existence of the jury instruction for reckless disregard did not correct any shortcomings in the child abuse instruction.

 {57} However, even assuming that the reckless disregard instruction did not correct the improper child abuse instruction, and that juror confusion persisted due to the order the instructions were given, any error in the child abuse instruction was harmless and not fundamental error. A definitional instruction is not necessary if, as matter of law, no rational juror could find that a defendant acted with less than criminal negligence. *See Magby,* 1998–NMSC–042, ¶ 11. Without acquitting Defendant, no rational juror could have found that Defendant shot David under the circumstances presented in this case without meeting the standard of criminal negligence. At the very least, Defendant was guilty of criminal negligence under the facts presented. We therefore affirm the conviction for child abuse resulting in death.

**Double Jeopardy**

██ {58} Having reversed the depraved mind murder conviction, and affirmed the child abuse resulting in death conviction, we now consider whether it would be in the interests of justice to remand for a new trial on the lesser-included offenses of first-degree murder, for which the jury received instructions, or to remand for entry of judgment on a lesser-included offense. *See State v. Villa,* 2004–NMSC–031, ¶ 9, 136 N.M. 367, 98 P.3d 1017.

{59} Defendant can only be convicted of one crime for David's death. *See Santillanes,* 2001–NMSC–018, ¶ 5 (" '[T]he generally accepted notion that one death should

result in only one homicide conviction' overcomes the presumption of multiple punishment."). Because we are affirming the child abuse resulting in death conviction, a conviction for second-degree murder or involuntary manslaughter would violate fundamental principles of double jeopardy. *See id.* (holding convictions for both child abuse and vehicular homicide resulting in death constitute a double jeopardy violation); *State v. Mann,* 2000–NMCA–088, ¶ 14, 129 N.M. 600, 11 P.3d 564 (concluding that convictions of both child abuse resulting in death and second-degree murder violate the general rule that one homicide by the acts of one defendant should result in one homicide conviction), *aff'd,* 2002–NMSC–001, 131 N.M. 459, 39 P.3d 124.

{60} Because we affirm the conviction for child abuse resulting in death, Defendant cannot be convicted twice for the lesser includes offenses of depraved mind murder. Thus, it would not be in the interests of justice to remand for a new trial or for entry of judgment on the lesser included offenses.

**CONCLUSION**

{61} We reverse Defendant's conviction for depraved mind murder, and affirm the conviction for child abuse resulting in death. On remand, we instruct the district court to vacate Defendant's conviction for depraved mind murder and adjust Defendant's sentence accordingly.

{62} **IT IS SO ORDERED.**

MINZNER, MAES and CHÁVEZ, JJ., concur.

SERNA, Justice (concurring in part and dissenting in part).

SERNA, Justice (concurring in part and dissenting in part).

{63} I concur in the majority's affirmance of the child abuse resulting in death conviction, but I respectfully dissent from the majority's reversal of the depraved mind murder conviction. I would affirm Defendant's conviction of first degree murder.

{64} Regarding the child abuse conviction, I agree with the majority that the Legislature has not restricted child abuse in

Section 30–6–1(D) to persons having a custodial relationship with the child, and I agree that the jury instructions did not create fundamental error. The jury was given an instruction defining "reckless disregard," and child abuse resulting in death was the only crime requiring this mental state. "The jury is presumed to follow the court's instructions." *State v. Gonzales*, 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992). I also agree with the majority's conclusion that, because we are affirming the child abuse resulting in death conviction and a conviction of second degree murder would violate the double jeopardy principle articulated in *State v. Santillanes*, 2001–NMSC–018, ¶ 5, 130 N.M. 464, 27 P.3d 456, it is unnecessary to decide whether to remand for a new trial or remand for entry of judgment on second degree murder. In either event, a conviction of the lesser offense of second degree murder would have to be vacated in favor of the greater offense of child abuse resulting in death. *See id.* ¶¶ 29–30; *State v. Pierce*, 110 N.M. 76, 86–87, 792 P.2d 408, 418–19 (1990).

{65} With respect to the majority's reversal of the depraved mind murder conviction, I believe that application of the appropriate standard of review shows that there was sufficient evidence to support this crime as it has been defined by the Legislature. Section 30–2–1(A) defines as first degree murder "the killing of one human being by another without lawful justification or excuse . . . by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." We have interpreted this provision to require subjective knowledge on the part of the defendant. *State v. Ibn Omar–Muhammad*, 102 N.M. 274, 277, 694 P.2d 922, 925 (1985). The defendant must have actual knowledge that his or her act is greatly dangerous to the lives of others. *See State v. Brown*, 1996–NMSC–073, ¶ 25, 122 N.M. 724, 931 P.2d 69 ("The malice required for depraved mind murder is an intent to commit an act imminently dangerous to others *or* with the subjective knowledge that the act creates a very high degree of risk to the lives of others, indicating a depraved mind regardless of human life."). We have further explained that "sufficient subjective knowledge exists if [the defen-

dant's] conduct was very risky, and under the circumstances *known to [the defendant]* [he or she] should have realized this very high degree of risk." *State v. McCrary*, 100 N.M. 671, 673, 675 P.2d 120, 122 (1984). We apply this standard because "the element of intent is seldom susceptible to direct proof and accordingly may be proved by circumstantial evidence. Seldom will an accused admit at trial that he [or she] actually knew that his [or her] acts placed another's life in great danger." *Id.* (citation omitted).

{66} The majority recognizes that the evidence in this case, viewed in a light most favorable to the verdict, supports an inference that Defendant's conduct of pulling the trigger of a loaded gun with others in the vicinity was outrageously reckless and supports a finding that the circumstances known to Defendant included the following: (1) the gun was functioning properly; (2) Defendant was aware of how the gun operated; (3) multiple people were in close proximity; and (4) Defendant loaded the gun himself. The majority also views Defendant's actions as a knowing homicide. In my view, these facts satisfy the definition of depraved mind murder set out by the Legislature and clarified by this Court in *Brown, McCrary,* and *Ibn Omar–Muhammad.* From these facts, I believe a rational trier fact could find beyond a reasonable doubt that Defendant's conduct was very risky, that is, greatly dangerous to the lives of others, and that, based on the circumstances known to him, Defendant knew of the very high degree of risk to the lives of others from his actions. By holding this evidence insufficient, I believe that the majority alters the crime of depraved mind murder from how it was conceived by the Legislature.

{67} It seems that the primary reason that the majority believes the evidence in this case to be insufficient is because Defendant's actions did not place more than one person at risk. However, I respectfully disagree with the majority on this point both factually and legally. From a factual standpoint, the majority assesses the risk to others based on the State's argument that Defendant intentionally pointed a loaded gun at the victim with knowledge that it could fire.

I believe that this overlooks Defendant's testimony that he pointed the gun at himself and to his side and pulled the trigger of a gun he knew he had loaded without paying any attention to what the other two individuals in the room were doing or where they were located. Under this testimony, a rational jury could conclude that Defendant's outrageously reckless conduct placed more than one life in danger. Again, the jury was not required to find that Defendant actually knew that the victim or Defendant's brother was in the line of fire. *See McCrary,* 100 N.M. at 673, 675 P.2d at 122. It would be sufficient for the jury to infer from the fact that Defendant knew that two other people were in the room that Defendant should have realized the very high degree of risk from absent-mindedly playing with a loaded gun and intentionally pulling the trigger. *See id.*

{68} Even under the factual scenario of Defendant pointing the gun at the victim, I respectfully disagree with the majority's legal conclusion that Defendant was required to place more than one life in danger. I do not believe this conclusion is supported by Section 30–2–1(A) or compelled by our case law. The majority relies on the committee commentary to UJI 14–203. However, this commentary says only that "[i]t is generally believed that this murder occurs when the accused does an act which is dangerous to more than one person." UJI 14–203 committee cmt. On the contrary, however, it is generally understood that "[f]or murder of the depraved-heart type . . . the required risk may be risk to a group of persons . . . or it may be risk only to a single person." 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.4(a), at 441 (2d ed.2003). In fact, three of the paradigmatic instances of depraved mind murder, cited in jurisdictions analogous to our own as well as in jurisdictions where it is a lesser crime, are a game of Russian roulette between two people, firing a gun with the intent to aim above someone's head but killing that person instead, and throwing a full beer mug at a person carrying a lighted oil lamp. *E.g.,* 2 LaFave, *supra,* § 14.4(a), at 440; *People v. Jefferson,* 748 P.2d 1223, 1227 (Colo.1988) (en banc) ("Examples of the kinds of conduct which would demonstrate 'depraved heart' murder

at common law include: the firing of a loaded gun, without provocation, into a moving train and the resultant death of an innocent bystander; the discharge of a firearm into a crowd of people[;] operating a vehicle at high speed[;] placing obstructions on a railroad track[;] throwing a heavy piece of timber from a roof onto a crowded street; pointing a revolver loaded with a single cartridge and firing it on the third pull of the trigger during a game of Russian Roulette; firing several shots into a home known to be occupied; intending to shoot over a victim's head in order to scare [the victim], but hitting [the victim] by 'mistake'; and throwing a heavy beer glass at a woman carrying a lighted oil lamp.") (citations omitted). All three of these situations involve a risk to only one person, but the act that results in the killing is so extremely reckless, and indicates such indifference to human life, that legislatures have designated it as depraved mind murder. *See, e.g., Neitzel v. State,* 655 P.2d 325, 338 (Alaska Ct.App.1982) (stating that a game of Russian roulette is "so dangerous and so lacking in social utility . . . that it demonstrates extreme indifference to human life and serves to distinguish murder from manslaughter").

{69} Committee commentary to a uniform jury instruction can be persuasive only to the extent that it is not inconsistent with existing law. *See State v. Johnson,* 2001–NMSC–001, ¶ 16, 130 N.M. 6, 15 P.3d 1233. Although the majority also relies on Section 30–2–1(A) as authority for requiring that multiple people be placed at risk, apparently deferring to the word "lives" rather than "life" in the statutory phrase "greatly dangerous to the lives of others," I do not believe that the language in the statute supports this interpretation, particularly given its historical origin. The above examples involving risk to a single person represent the common law view of the crime of depraved mind murder. We have previously said that it is this common law view of the crime of murder that our Legislature intended to adopt in 1907 when it set out depraved mind murder in exactly the same terms as the current statute, including the use of the word "lives." *See Territory v. Montoya,* 17

N.M. 122, 127, 125 P. 622, 623 (1912) ("[O]ur statute does not attempt to change the definition of the crime of murder as known to the common law."); *see also* 1907 N.M. Laws ch. 36, § 1. Our Legislature certainly would have been aware of the famous 1883 example of the beer glass and the oil lamp, and its application to a single person being put at risk, but the Legislature did not indicate any intent to depart from this common-law understanding of the crime. *See Sims v. Sims*, 1996–NMSC–078, ¶ 22, 122 N.M. 618, 930 P.2d 153 ("[N]o innovation upon the common law that is not clearly expressed by the legislature will be presumed."). While some jurisdictions have explicitly applied depraved mind murder to conduct that places only a single person at risk, other jurisdictions and the Model Penal Code have contemplated the application of the crime of depraved mind murder to such conduct even with a definition of the crime that includes a plural term substantially similar to our own statute's use of the word "lives." *E.g.*, Model Penal Code § 210.2 cmt. 4, at 22–23 (1962). In addition, it is a basic rule of statutory construction that, absent any indication to the contrary, "[u]se of the singular number includes the plural, and use of the plural number includes the singular." NMSA 1978, § 12–2A–5(A) (1997). Therefore, I believe that, consistent with the common law view of the crime, the Legislature did not intend to restrict depraved mind murder to conduct placing multiple individuals at risk.

{70} In *McCrary*, for example, in which the defendants fired at tractor-trailers and cabs, the individual who was killed was in a sleeping compartment in one of the cabs. 100 N.M. at 672, 675 P.2d at 121. However, there is no indication that anyone else was in the trucks at the time of the shooting, and the defendants "waited until they thought all people had left the carnival [and] circled two or three times to make sure no one would get hurt." *Id.* at 673, 675 P.2d at 122. Our holding in that case was not based on multiple people having been put at risk; instead, we stated that, "[i]n light of the surrounding circumstances, Defendants should have realized the risk of *someone* sleeping in the sleeper compartment." *Id.* (emphasis added).

{71} Under our current statutory scheme, I would agree that when an intent to kill exists, then there should be a requirement that multiple people be put at risk in order to constitute depraved mind murder. The Legislature has indicated that an intentional killing unaccompanied by deliberation and not committed in the course of a felony, such as a rash or impulsive killing, should be second degree murder. *See State v. Garcia*, 114 N.M. 269, 273, 837 P.2d 862, 866 (1992). While an intentional killing may be perceived as "depraved" in a certain sense under particular facts, it is not sufficient without more to qualify as first degree murder. *See State v. DeSantos*, 89 N.M. 458, 461, 553 P.2d 1265, 1268 (1976). A rash, intentional killing does not rise to the level of depraved mind murder unless the method of killing places multiple people at risk, whether the person killed is the intended victim or a bystander. *See State v. Salazar*, 1997–NMSC–044, ¶ 47, 123 N.M. 778, 945 P.2d 996; *State v. Sena*, 99 N.M. 272, 274, 657 P.2d 128, 130 (1983). This additional requirement in the context of an intent to kill stems from our understanding of depraved mind murder as being an unintentional killing. *See State v. Baca*, 1997–NMSC–059, ¶ 51, 124 N.M. 333, 950 P.2d 776 (holding that the crime of conspiracy to commit depraved mind murder does not exist in New Mexico law); *State v. Rogers*, 31 N.M. 485, 509, 247 P. 828, 838 (1926) (holding that assault with intent to commit murder cannot be based on reckless acts, even if those acts demonstrate a depraved mind, because the crime requires an intent to kill that is not found in depraved mind murder); *State v. Johnson*, 103 N.M. 364, 369, 707 P.2d 1174, 1179 (Ct.App.1985) (holding that attempt to commit depraved mind murder is not a crime in New Mexico). Indeed, the cases in which we have applied a requirement of danger to more than one person have involved an intentional killing in which only the life of the intended victim was placed at risk. *State v. Haynie*, 116 N.M. 746, 747, 867 P.2d 416, 417 (1994); *DeSantos*, 89 N.M. at 461, 553 P.2d at 1268. These cases are consistent with the Legislature's definition of second degree murder and effectuate the Legislature's intended scheme in its classification of inten-

tional killings. However, for killings that occur as the result of outrageously reckless behavior, such as the classic examples mentioned above, I do not believe that the Legislature intended to diverge from the common law understanding of the crime as encompassing those acts that may be directed at only one person. For example, in one case, a defendant fired a gun numerous times in the direction of his girlfriend, who was sitting down, with the first several bullets striking the ground within an inch of the victim and the final bullet hitting the victim in the head and killing her. *Neitzel*, 655 P.2d at 326. The defendant did not intend to kill the victim, but "[e]yewitnesses were unsure of whether [the defendant] fired at [the victim] to discipline her for drinking vodka which belonged to him, to frighten her, to demonstrate his marksmanship by seeing how close he could come without hitting her, or to just have fun with his rifle." *Id.* Whatever the defendant's purpose, conduct of this nature, even though directed at one person, evidences such total indifference to the value of human life that it satisfies the definition of depraved mind murder. *Id.* at 338 (describing the conduct as "closely approximat[ing] the examples frequently used in the common law and in the Model Penal Code to differentiate reckless murder from manslaughter"). I believe that the Legislature's adoption of the common law form of depraved mind murder indicates an intent to encompass this type of egregious conduct. Further, by categorizing the common law form of depraved mind murder as first degree murder, the Legislature has deemed conduct of this nature so heinous and reprehensible that it is the functional equivalent of deliberate intent murder and receives greater punishment than a rash, albeit intentional, killing due to the increased culpability from the defendant's extreme indifference to the value of human life. *See Salazar*, 1997–NMSC–044,

¶ 42 ("Depraved mind murder involves blameworthiness and culpability comparable to deliberate premeditated murder."); *Brown*, 1996–NMSC–073, ¶ 27 ("In fact, the depraved mind or extreme indifference aspect required for first-degree depraved mind murder brings it more in line with the 'specific intent' or cool deliberation requirements of Section 30–2–1(A)(1) (first-degree premeditated or willful killing)."); *see also Tison v. Arizona*, 481 U.S. 137, 157, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) ("[S]ome nonintentional murderers may be among the most dangerous and inhumane of all-the person who tortures another not caring whether the victim lives or dies . . . .").

{72} As the majority indicates, the jury could reasonably have found from the facts in this case that Defendant intentionally pointed the gun at David and even, based on Defendant's prior knowledge of the functioning of the gun, the evidence that the gun functioned properly, and his intentional loading of the gun, that he intended for the gun to fire but that he did not intend to kill David. The jury could have believed that Defendant was attempting to play a practical joke on the victim or trying to scare him. Otherwise, why would Defendant have intentionally loaded the gun? Defendant testified that there was no real reason that he loaded the gun and that he was just playing with it. However, if his only intent was to play with the gun or "click" it, he could have, and in fact did, accomplish this without the gun being loaded. From the jury's perspective, Defendant must have had a reason to take the extraordinary step, beyond the already reckless act of pulling out a gun in the presence of others and pulling the trigger, of intentionally putting a bullet in the gun and then intentionally pulling the trigger knowing that it was loaded.[1] Defendant's flight and his brother's lies after the killing is evidence of a consciousness of guilt that

---

1. These facts, coupled with the location of the wound, make the likelihood of a game of chance or similar outrageously reckless conduct far more likely than a mere accidental shooting and is not, in my view, evidence equally consistent with two inferences. The fact that there was no eyewitness testimony or other direct evidence supporting an inference of this nature is not determinative in a review for sufficient evidence.

*See State v. Bell*, 90 N.M. 134, 137, 560 P.2d 925, 928 (1977). "[T]he test to determine the sufficiency of evidence in New Mexico . . . is whether substantial evidence *of either a direct or circumstantial nature* exists to support a verdict of guilt beyond a reasonable doubt with respect to every essential element to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988) (emphasis added).

would support this view of the killing by a rational jury.[2] If the jury made this reasonable inference, then this case would mirror either a situation involving Russian roulette or one in which a gun was aimed above someone's head, both of which are paradigmatic instances of depraved mind murder and both of which, fitting the common law definition of depraved mind murder, fall within the Legislature's definition of depraved mind murder in Section 30–2–1(A). *See State v. Robinson*, 261 Kan. 865, 934 P.2d 38, 49 (1997) ("[T]he classic example of depraved heart murder [is] when a defendant unintentionally kills a friend through the game of Russian roulette. In such a case, the defendant demonstrated extreme indifference to the value of only one specific human life, the friend with which he [or she] was playing Russian roulette, but the defendant's conduct still qualified as depraved heart murder . . . .").

{73} While the cases cited by the majority may have been based on "particularly egregious facts," such as "repeated and indiscriminate firing of a weapon," *e.g., People v. Jernatowski*, 238 N.Y. 188, 144 N.E. 497 (1924), these cases did not purport to limit depraved mind murder to such facts. In fact, cases have upheld depraved mind murder convictions under facts remarkably similar to the present case. *See State v. Tanguay*, 574 A.2d 1359, 1361 (Me.1990) (reviewing evidence that the defendant and the victim handed a gun back and forth and that the defendant rolled the cylinder in a gun that he knew could contain two bullets and observing, based on the defendant's comments and actions having demonstrated that he was playing a type of Russian roulette immediately prior to the shooting, that the jury "made a discriminating assessment of the evidence by acquitting defendant of intentionally killing the victim" but convicting of depraved indifference murder); *People v. Sanchez*, 98 N.Y.2d 373, 748 N.Y.S.2d 312, 777 N.E.2d 204, 206 (2002) (stating in

the context of a defendant recklessly firing a single bullet at his friend from twelve to eighteen inches away that the "defendant's shooting into the victim's torso at point-blank range presented such a transcendent risk of causing his death that it readily meets the level of manifested depravity needed to establish" depraved mind murder); *People v. Roe*, 74 N.Y.2d 20, 544 N.Y.S.2d 297, 542 N.E.2d 610, 613 (1989) (affirming a depraved mind murder conviction for a killing caused by pulling the trigger a single time, and consequently firing a single bullet, from ten feet away from the victim when evidence indicated that it occurred during a game of Polish roulette, despite the defendant's testimony that the gun slipped and discharged accidentally); *see also State v. Baker*, No. COA01–710, 150 N.C.App. 717, 565 S.E.2d 112, 2002 WL 1312670, at *2–4 (N.C.Ct.App.2002) (unpublished) (upholding a depraved mind murder conviction based on the defendant's conduct of pointing a gun believed to be unloaded at a friend after playing video games and pulling the trigger once while "'just playing around'" with the gun and stating that "[w]hether or not defendant realized that the gun was loaded, his conduct was extremely reckless and utterly without regard for [the victim's] life"). Of particular note, the jurisdiction relied upon by the majority, New York, has indicated that the more times a defendant fires a gun, the more likely it is that the shooting was intentional and *not* depraved mind murder. *People v. Payne*, 3 N.Y.3d 266, 786 N.Y.S.2d 116, 819 N.E.2d 634, 637 (2004). In any event, there is nothing in Section 30–2–1(A) that would suggest that the Legislature intended to require the repeated and indiscriminate firing of a weapon.

{74} The majority states that the facts in this case "do not lend themselves to one obvious conclusion" and that in our other cases "there was no question that the defen-

---

**2.** In fact, if the jury believed that Defendant was trying to scare the victim or play a practical joke on him, then the jury might reasonably have inferred from the brother's lies and the multiple bullet holes in the victim's shirt, combined with the forensic testimony that the bullet was fired from four to ten feet away, that Defendant's

brother could have been holding the victim as part of the prank. If the jury made this inference, then Defendant's act of pointing the gun at the victim would have been greatly dangerous to the life of his brother in addition to the life of the victim.

dant acted intentionally in firing the weapon." In my view, these statements overlook the appropriate standard of review. The question in this case is not whether this Court agrees with the jury's verdict or whether the verdict reached by the jury was inescapable; it is whether, after viewing the evidence in a light most favorable to the verdict and indulging all reasonable inferences in support thereof, any rational jury could have found the elements of the crime beyond a reasonable doubt. *See State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994). The State is not required "to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "An appellate court does not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *Sutphin,* 107 N.M. at 130–31, 753 P.2d at 1318–19. Although I agree with the majority that this would be a close and difficult case for a fact-finder, I believe that there is ample evidence to support the verdict reached by the jury. I would not second-guess the jury's verdict or substitute my view for that of the jury.

{75} The majority also contends that affirming Defendant's conviction would transform all accidental shootings into depraved mind murder. I respectfully disagree. The facts in this case, viewed in a light most favorable to the verdict, do not support an "accidental" shooting. A rational jury could have found beyond a reasonable doubt that Defendant intentionally loaded the gun, intentionally pointed the gun at the victim, and intentionally pulled the trigger. These facts demonstrate outrageous recklessness on the part of Defendant and unquestionably distinguish this case from one involving mere negligence, or even recklessness, with a tragic result.

{76} The majority believes that only the "thinnest of distinctions" can be made between depraved mind murder and second degree murder. However, as we explained in *Brown,* depraved mind murder consists of two significant distinguishing elements. First, depraved mind murder requires outra-geous recklessness, which serves as evidence of a depraved mind regardless of human life. *See Brown,* 1996–NMSC–073, ¶ 15. Second, in order to further assure that the defendant acted with a depraved mind, we require subjective knowledge that the act was extremely dangerous to the lives of others. *Id.* ¶ 16 ("The required *mens rea* element of 'subjective knowledge' serves as proof that the defendant acted with a 'depraved mind' or 'wicked or malignant heart' and with utter disregard for human life."); *see State v. Primeaux,* 328 N.W.2d 256, 258 (S.D.1982) ("[T]he 'depraved mind' requirement is a genuine additional element ...."). Neither of these elements are required for second degree murder. A strong probability of death or great bodily harm, which is required for second degree murder, is a lesser standard than extreme danger to the lives of others. *See Neitzel,* 655 P.2d at 337 ("[T]he significant distinction is in the likelihood that a death will result from the defendant's act."); *People v. Register,* 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d 704, 707 (1983) (distinguishing between the required "grave risk of death" for depraved mind murder and the "lesser" standard of substantial risk of death); *see also Ibn Omar–Muhammad,* 102 N.M. at 278, 694 P.2d at 926 (stating that the difference between the extreme recklessness requirement of depraved mind murder and ordinary recklessness "is one of degree, not of kind"). In addition, "[s]econd-degree murder ... contains a component involving an 'objective knowledge' of the risk, without the required showing that the risk-creating act was performed with a wicked and malignant heart." *Brown,* 1996–NMSC–073, ¶ 16. "Unlike second-degree murder, the new 'subjective knowledge element' of depraved mind murder does not include the imputed knowledge that an ordinary person would be expected to have." *Id.* ¶ 26. In fact, to emphasize the importance of this distinction in *Brown,* we overruled precedent that had held that second degree murder contains a subjective knowledge standard similar to depraved mind murder. *Id.* These two important and substantial distinguishing elements create a meaningful difference between depraved mind murder and second degree murder.

{77} Although I believe that we sufficiently distinguished depraved mind murder from second degree murder in *Brown,* I agree with the majority that our jury instructions should be clarified. The depraved mind murder instruction the jury received in this case reproduces the Legislature's definition of the crime practically verbatim and is, I believe, a correct statement of the law. If Defendant wanted any further definition of depraved mind, it was incumbent upon him to request it. *See State v. Carnes,* 97 N.M., 76, 78, 636 P.2d 895, 897 (Ct.App.1981) ("The failure to instruct the jury on the definition or the amplification of the elements of an offense is not error when there has been a failure to request such an instruction."). Nonetheless, as shown by the closing argument of both parties, as well as by the committee commentary to our UJIs, a misunderstanding of the crime of depraved mind murder persists. Defense counsel incorrectly argued reckless disregard as the mens rea for depraved mind murder, and the prosecutor inaccurately told the jury that an idiot combined with a loaded firearm equals depraved mind murder. As the majority indicates, a clearer definition of "depraved mind" could help juries better understand the crime of depraved mind murder. However, I believe that the changes to our UJIs must be more sweeping to fully communicate to juries the difference between depraved mind murder and second degree murder.

{78} Initially, I am concerned that a definition of "depraved mind" might still leave the element unclear. For example, many of the descriptions of "depraved mind" in our cases contain arcane language, such as "depraved kind of wantonness" and "wicked and malignant heart," that may not assist juries in truly understanding the Legislature's intent any more than the statutory phrase itself. In fact, the drafters of the Model Penal Code addressed this very problem and concluded that definitional instructions or expansive descriptions of the requisite mental state may actually impede jury deliberations. Instead, Model Penal Code replaced the common law language of depraved mind or depraved heart with the phrase "extreme indifference to the value of human life." Model

Penal Code § 210.2. The commentary explains as follows:

> [I]t seems undesirable to suggest a more specific formulation. The variations [in terminology used in different jurisdictions] retain in some instances greater fidelity to the common-law phrasing but they do so at great cost in clarity. Equally obscure are the several attempts to depart from the common law .... The result of these formulations is that the method of defining reckless murder is impaired in its primary purpose of communicating to jurors in ordinary language the task expected of them. The virtue of the Model Penal Code language is that it is a simpler and more direct method by which this function can be performed.

Model Penal Code § 210.2 cmt. 4, at 25–26.

{79} Instead of defining the term "depraved mind," the committee might find it more appropriate to change the phrasing of the element itself to make it "simpler and more direct." As noted previously, the language in the present UJI follows the language of the statute, but perhaps the incorporation of the language in the Model Penal Code, with the phrase "indicating an extreme indifference to the value of human life," would be clearer to juries than "indicating a depraved mind without regard for human life." An instruction of this nature would not require further amplification and would effectively communicate the meaning of the crime intended by the Legislature. *See State v. Barstad,* 93 Wash.App. 553, 970 P.2d 324, 331 (1999) ("[T]he courts have not attempted to further define 'extreme indifference'; rather, the particular facts of each case are what illustrate its meaning. There is no need for further definition."); *see also Neitzel,* 655 P.2d at 338.

{80} I also believe it would be useful to explain to the jury, as we explained in *Brown,* that it is both the outrageously reckless conduct *and* the defendant's subjective knowledge of the extreme danger to the lives of others that demonstrates a depraved mind. *See Brown,* 1996–NMSC–073, ¶ 16 (" '[S]ubjective knowledge' serves as proof that the defendant acted with a 'depraved

mind' ...."); *Ibn Omar–Muhammad,* 102 N.M. at 278–79, 694 P.2d at 926–27 (explaining that extremely reckless conduct serves as evidence of an extreme indifference to the value of human life). Our current instructions refer to the "depraved mind" aspect of the crime only in element three, describing the required act, and not in element four, describing the requirement of subjective knowledge. *Cf. Barstad,* 970 P.2d at 330 (discussing a jury instruction containing three separate elements requiring that the defendant "engage[ ] in conduct creating a grave risk of death to others," that the defendant "know[ ] of and disregard[ ] the grave risk of death to others," and that the "conduct *and* disregard of such grave risk occur[ ] under circumstances which manifest [the defendant's] extreme indifference to human life") (emphasis added).

{81} To me, however, the primary lack of clarity in our jury instructions does not come from the elements of depraved mind murder in UJI 14–203. This instruction follows the language of the statute and, while certainly subject to improvement, correctly states the law. Instead, the primary problem lies in the elements of second degree murder in UJI 14–210 and UJI 14–211. As explained above, we have held that depraved mind murder differs from second degree murder because it requires a "subjective knowledge" on the part of the defendant, whereas second degree murder requires only "objective knowledge." *Brown,* 1996–NMSC–073, ¶ 16. However, our UJIs do not implement this critical distinction. The jury instructions for both crimes, first degree depraved mind murder and second degree murder, contain an element of subjective knowledge. It does not seem unlikely that it is this oversight in our UJIs that has caused the majority so much difficulty in trying to distinguish the two crimes as described in the instructions given to the jury in this case. In fact, the commentary to UJI 14–203, while correctly stating that the instruction contains "a subjective test for 'depraved mind murder,'" goes on to say that "[s]econd-degree murder provides an objective test *for depraved mind murder.*" (Emphasis added.) The commentary to UJI 14–211 further obscures the distinction between the two crimes by stating that "[s]econd degree murder is committed when death results from acts which the defendant knew created a strong probability of death or great bodily harm. *This was formerly known as 'depraved heart' murder, which is also murder in the first degree.*" (Emphasis added.) Contrary to this view, there are not two forms of depraved mind murder in New Mexico; there is only one form of depraved mind murder, and the Legislature has classified it as first degree murder. The combination of the commentary and the incomplete description of the mens rea for second degree murder in the UJIs has resulted in the elements for depraved mind murder and second degree murder being far more similar than they should be under our cases. The current UJIs completely omit the "major distinction between the two degrees of murder" that we articulated in *Brown,* 1996–NMSC–073, ¶ 14. Based on the objective knowledge standard for second degree murder articulated in *Brown* and our other cases, the instruction for second degree murder should require that the defendant knew or *should have known* that his or her acts created a strong probability of death or great bodily harm. *See id.* ¶ 26 ("Unlike second-degree murder, the new 'subjective knowledge element' of depraved mind murder does not include the imputed knowledge that an ordinary person would be expected to have."); *see also Ibn Omar–Muhammad,* 102 N.M. at 277, 694 P.2d at 925 (describing the "objective standard of knowledge of the risk" with the phrase "should have known" and rejecting this standard for depraved mind murder because "[t]he requisite knowledge is a subjective one").

{82} Because I believe that there is sufficient evidence to support the jury's verdict under the appropriate standard of review, I would affirm Defendant's depraved mind murder conviction. The majority holding otherwise, I respectfully dissent from this portion of the majority opinion.